John R. TOGSTAD, et al., Respondents,

v.

VESELY, OTTO, MILLER & KEEFE and Jerre Miller, Appellants.

No. 49483.

Supreme Court of Minnesota.

April 11, 1980.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and O. C. Adamson II, Minneapolis, Collins & Buckley and Theodore J. Collins, St. Paul, for appellants.

DeParcq, Anderson, Perl, Hunegs & Rudquist and Donald L. Rudquist, Minneapolis, for respondents.

PER CURIAM.

This is an appeal by the defendants from a judgment of the Hennepin County District Court involving an action for legal malpractice. The jury found that the defendant attorney Jerre Miller was negligent and that, as a direct result of such negligence, plaintiff John Togstad sustained damages in the amount of $610,500 and his wife, plaintiff Joan Togstad, in the amount of $39,000. Defendants (Miller and his law firm) appeal to this court from the denial of their motion for judgment notwithstanding the verdict or, alternatively, for a new trial. We affirm.

In August 1971, John Togstad began to experience severe headaches and on August 16, 1971, was admitted to Methodist Hospital where tests disclosed that the headaches were caused by a large aneurism [1] on the left internal carotid artery.[2] The attending physician, Dr. Paul Blake, a neurological surgeon, treated the problem by applying a Selverstone clamp to the left common carotid artery. The clamp was surgically implanted on August 27, 1971, in Togstad's neck to allow the gradual closure of the artery over a period of days.

The treatment was designed to eventually cut off the blood supply through the artery and thus relieve the pressure on the aneurism, allowing the aneurism to heal. It was anticipated that other arteries, as well as the brain's collateral or cross-arterial system would supply the required blood to the portion of the brain which would ordinarily have been provided by the left carotid artery. The greatest risk associated with this procedure is that the patient may become paralyzed if the brain does not receive an adequate flow of blood. In the event the supply of blood becomes so low as to endanger the health of the patient, the adjustable clamp can be opened to establish the proper blood circulation.

In the early morning hours of August 29, 1971, a nurse observed that Togstad was unable to speak or move. At the time, the clamp was one-half (50%) closed. Upon discovering Togstad's condition, the nurse called a resident physician, who did not adjust the clamp. Dr. Blake was also immediately informed of Togstad's condition and arrived about an hour later, at which time he opened the clamp. Togstad is now severely paralyzed in his right arm and leg, and is unable to speak.

Plaintiffs' expert, Dr. Ward Woods, testified that Togstad's paralysis and loss of speech was due to a lack of blood supply to his brain. Dr. Woods stated that the inadequate blood flow resulted from the clamp being 50% closed and that the negligence of Dr. Blake and the hospital precluded the clamp's being opened in time to avoid permanent brain damage. Specifically, Dr. Woods claimed that Dr. Blake and the hospital were negligent for (1) failing to place the patient in the intensive care unit or to have a special nurse conduct certain neurological tests every half-hour; (2) failing to write adequate orders; (3) failing to open the clamp immediately upon discovering that the patient was unable to speak; and

---

1. An aneurism is a weakness or softening in an artery wall which expands and bulges out over a period of years.

2. The left internal carotid artery is one of the major vessels which supplies blood to the brain.

(4) the absence of personnel capable of opening the clamp.

Dr. Blake and defendants' expert witness, Dr. Shelly Chou, testified that Togstad's condition was caused by blood clots going up the carotid artery to the brain. They both alleged that the blood clots were not a result of the Selverstone clamp procedure. In addition, they stated that the clamp must be about 90% closed before there will be a slowing of the blood supply through the carotid artery to the brain. Thus, according to Drs. Blake and Chou, when the clamp is 50% closed there is no effect on the blood flow to the brain.

About 14 months after her husband's hospitalization began, plaintiff Joan Togstad met with attorney Jerre Miller regarding her husband's condition. Neither she nor her husband was personally acquainted with Miller or his law firm prior to that time. John Togstad's former work supervisor, Ted Bucholz, made the appointment and accompanied Mrs. Togstad to Miller's office. Bucholz was present when Mrs. Togstad and Miller discussed the case.[3]

Mrs. Togstad had become suspicious of the circumstances surrounding her husband's tragic condition due to the conduct and statements of the hospital nurses shortly after the paralysis occurred. One nurse told Mrs. Togstad that she had checked Mr. Togstad at 2 a. m. and he was fine; that when she returned at 3 a. m., by mistake, to give him someone else's medication, he was unable to move or speak; and that if she hadn't accidentally entered the room no one would have discovered his condition until morning. Mrs. Togstad also noticed that the other nurses were upset and crying, and that Mr. Togstad's condition was a topic of conversation.

Mrs. Togstad testified that she told Miller "everything that happened at the hospital," including the nurses' statements and conduct which had raised a question in her mind. She stated that she "believed" she had told Miller "about the procedure and what was undertaken, what was done, and what happened." She brought no records with her. Miller took notes and asked questions during the meeting, which lasted 45 minutes to an hour. At its conclusion, according to Mrs. Togstad, Miller said that "he did not think we had a legal case, however, he was going to discuss this with his partner." She understood that if Miller changed his mind after talking to his partner, he would call her. Mrs. Togstad "gave it" a few days and, since she did not hear from Miller, decided "that they had come to the conclusion that there wasn't a case." No fee arrangements were discussed, no medical authorizations were requested, nor was Mrs. Togstad billed for the interview.

Mrs. Togstad denied that Miller had told her his firm did not have expertise in the medical malpractice field, urged her to see another attorney, or related to her that the statute of limitations for medical malpractice actions was two years. She did not consult another attorney until one year after she talked to Miller. Mrs. Togstad indicated that she did not confer with another attorney earlier because of her reliance on Miller's "legal advice" that they "did not have a case."

On cross-examination, Mrs. Togstad was asked whether she went to Miller's office "to see if he would take the case of [her] husband * * *." She replied, "Well, I guess it was to go for legal advice, what to do, where shall we go from here? That is what we went for." Again in response to defense counsel's questions, Mrs. Togstad testified as follows:

Q And it was clear to you, was it not, that what was taking place was a preliminary discussion between a prospective client and lawyer as to whether or not they wanted to enter into an attorney-client relationship?

A I am not sure how to answer that. It was for legal advice as to what to do.

---

3. Bucholz, who knew Miller through a local luncheon club, died prior to the trial of the instant action.

Q And Mr. Miller was discussing with you your problem and indicating whether he, as a lawyer, wished to take the case, isn't that true?

A Yes.

On re-direct examination, Mrs. Togstad acknowledged that when she left Miller's office she understood that she had been given a "qualified, quality legal opinion that [she and her husband] did not have a malpractice case."

Miller's testimony was different in some respects from that of Mrs. Togstad. Like Mrs. Togstad, Miller testified that Mr. Bucholz arranged and was present at the meeting, which lasted about 45 minutes. According to Miller, Mrs. Togstad described the hospital incident, including the conduct of the nurses. He asked her questions, to which she responded. Miller testified that "[t]he only thing I told her [Mrs. Togstad] after we had pretty much finished the conversation was that there was nothing related in her factual circumstances that told me that she had a case that our firm would be interested in undertaking."

Miller also claimed he related to Mrs. Togstad "that because of the grievous nature of the injuries sustained by her husband, that this was only my opinion and she was encouraged to ask another attorney if she wished for another opinion" and "she ought to do so promptly." He testified that he informed Mrs. Togstad that his firm "was not engaged as experts" in the area of medical malpractice, and that they associated with the Charles Hvass firm in cases of that nature. Miller stated that at the end of the conference he told Mrs. Togstad that he would consult with Charles Hvass and if Hvass's opinion differed from his, Miller would so inform her. Miller recollected that he called Hvass a "couple days" later and discussed the case with him. It was Miller's impression that Hvass thought there was no liability for malpractice in the case. Consequently, Miller did not communicate with Mrs. Togstad further.

On cross-examination, Miller testified as follows:

Q Now, so there is no misunderstanding, and I am reading from your deposition, you understood that she was consulting with you as a lawyer, isn't that correct?

A That's correct.

Q That she was seeking legal advice from a professional attorney licensed to practice in this state and in this community?

A I think you and I did have another interpretation or use of the term "Advice". She was there to see whether or not she had a case and whether the firm would accept it.

Q We have two aspects; number one, your legal opinion concerning liability of a case for malpractice; number two, whether there was or wasn't liability, whether you would accept it, your firm, two separate elements, right?

A I would say so.

Q Were you asked on page 6 in the deposition, folio 14, "And you understood that she was seeking legal advice at the time that she was in your office, that is correct also, isn't it?" And did you give this answer, "I don't want to engage in semantics with you, but my impression was that she and Mr. Bucholz were asking my opinion after having related the incident that I referred to." The next question, "Your legal opinion?" Your answer, "Yes." Were those questions asked and were they given?

MR. COLLINS: Objection to this, Your Honor. It is not impeachment.

THE COURT: Overruled.

THE WITNESS: Yes, I gave those answers. Certainly, she was seeking my opinion as an attorney in the sense of whether or not there was a case that the firm would be interested in undertaking.

Kenneth Green, a Minneapolis attorney, was called as an expert by plaintiffs. He stated that in rendering legal advice regarding a claim of medical malpractice, the "minimum" an attorney should do would be

to request medical authorizations from the client, review the hospital records, and consult with an expert in the field. John McNulty, a Minneapolis attorney, and Charles Hvass testified as experts on behalf of the defendants. McNulty stated that when an attorney is consulted as to whether he will take a case, the lawyer's only responsibility in refusing it is to so inform the party. He testified, however, that when a lawyer is asked his legal opinion on the merits of a medical malpractice claim, community standards require that the attorney check hospital records and consult with an expert before rendering his opinion.

Hvass stated that he had no recollection of Miller's calling him in October 1972 relative to the Togstad matter. He testified that:

> A * * * when a person comes in to me about a medical malpractice action, based upon what the individual has told me, I have to make a decision as to whether or not there probably is or probably is not, based upon that information, medical malpractice. And if, in my judgment, based upon what the client has told me, there is not medical malpractice, I will so inform the client.

Hvass stated, however, that he would never render a "categorical" opinion. In addition, Hvass acknowledged that if he were consulted for a "legal opinion" regarding medical malpractice and 14 months had expired since the incident in question, "ordinary care and diligence" would require him to inform the party of the two-year statute of limitations applicable to that type of action.

This case was submitted to the jury by way of a special verdict form. The jury found that Dr. Blake and the hospital were negligent and that Dr. Blake's negligence (but not the hospital's) was a direct cause of the injuries sustained by John Togstad; that there was an attorney-client contractual relationship between Mrs. Togstad and Miller; that Miller was negligent in rendering advice regarding the possible claims of Mr. and Mrs. Togstad; that, but for Miller's negligence, plaintiffs would have been suc-

cessful in the prosecution of a legal action against Dr. Blake; and that neither Mr. nor Mrs. Togstad was negligent in pursuing their claims against Dr. Blake. The jury awarded damages to Mr. Togstad of $610,-500 and to Mrs. Togstad of $39,000.

On appeal, defendants raise the following issues:

(1) Did the trial court err in denying defendants' motion for judgment notwithstanding the jury verdict?

(2) Does the evidence reasonably support the jury's award of damages to Mrs. Togstad in the amount of $39,000?

(3) Should plaintiffs' damages be reduced by the amount of attorney fees they would have paid had Miller successfully prosecuted the action against Dr. Blake?

(4) Were certain comments of plaintiffs' counsel to the jury improper and, if so, were defendants entitled to a new trial?

■ 1. In a legal malpractice action of the type involved here, four elements must be shown: (1) that an attorney-client relationship existed; (2) that defendant acted negligently or in breach of contract; (3) that such acts were the proximate cause of the plaintiffs' damages; (4) that but for defendant's conduct the plaintiffs would have been successful in the prosecution of their medical malpractice claim. *See, Christy v. Saliterman,* 288 Minn. 144, 179 N.W.2d 288 (1970).

This court first dealt with the element of lawyer-client relationship in the decision of *Ryan v. Long,* 35 Minn. 394, 29 N.W. 51 (1886). The *Ryan* case involved a claim of legal malpractice and on appeal it was argued that no attorney-client relation existed. This court, without stating whether its conclusion was based on contract principles or a tort theory, disagreed:

> [I]t sufficiently appears that plaintiff, for himself, called upon defendant, as an attorney at law, for "legal advice," and that defendant assumed to give him a professional opinion in reference to the matter as to which plaintiff consulted him. Upon this state of facts the defendant must be taken to have acted as plaintiff's

legal adviser, at plaintiff's request, and so as to establish between them the relation of attorney and client.

*Id.* (citation omitted). More recent opinions of this court, although not involving a detailed discussion, have analyzed the attorney-client consideration in contractual terms. *See, Ronnigen v. Hertogs,* 294 Minn. 7, 199 N.W.2d 420 (1972); *Christy v. Saliterman, supra.* For example, the *Ronnigen* court, in affirming a directed verdict for the defendant attorney, reasoned that "[u]nder the fundamental rules applicable to contracts of employment * * * the evidence would not sustain a finding that defendant either expressly or impliedly promised or agreed to represent plaintiff * * *." 294 Minn. 11, 199 N.W.2d 422. The trial court here, in apparent reliance upon the contract approach utilized in *Ronnigen* and *Christy, supra,* applied a contract analysis in ruling on the attorney-client relationship question. This has prompted a discussion by the *Minnesota Law Review,* wherein it is suggested that the more appropriate mode of analysis, at least in this case, would be to apply principles of negligence, *i. e.,* whether defendant owed plaintiffs a duty to act with due care. 63 Minn. L.Rev. 751 (1979).

■ We believe it is unnecessary to decide whether a tort or contract theory is preferable for resolving the attorney-client relationship question raised by this appeal. The tort and contract analyses are very similar in a case such as the instant one,[4] and we conclude that under either theory the evidence shows that a lawyer-client relationship is present here. The thrust of

Mrs. Togstad's testimony is that she went to Miller for legal advice, was told there wasn't a case, and relied upon this advice in failing to pursue the claim for medical malpractice. In addition, according to Mrs. Togstad, Miller did not qualify his legal opinion by urging her to seek advice from another attorney, nor did Miller inform her that he lacked expertise in the medical malpractice area. Assuming this testimony is true, as this court must do, *see, Cofran v. Swanman,* 225 Minn. 40, 29 N.W.2d 448 (1947),[5] we believe a jury could properly find that Mrs. Togstad sought and received legal advice from Miller under circumstances which made it reasonably foreseeable to Miller that Mrs. Togstad would be injured if the advice were negligently given. Thus, under either a tort or contract analysis, there is sufficient evidence in the record to support the existence of an attorney-client relationship.

■ Defendants argue that even if an attorney-client relationship was established the evidence fails to show that Miller acted negligently in assessing the merits of the Togstads' case. They appear to contend that, at most, Miller was guilty of an error in judgment which does not give rise to legal malpractice. *Meagher v. Kavli,* 256 Minn. 54, 97 N.W.2d 370 (1959). However, this case does not involve a mere error of judgment. The gist of plaintiffs' claim is that Miller failed to perform the minimal research that an ordinarily prudent attorney would do before rendering legal advice in a case of this nature. The record, through the testimony of Kenneth Green

---

4. Under a negligence approach it must essentially be shown that defendant rendered legal advice (not necessarily at someone's request) under circumstances which made it reasonably foreseeable to the attorney that if such advice was rendered negligently, the individual receiving the advice might be injured thereby. *See, e. g., Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928). Or, stated another way, under a tort theory, "[a]n attorney-client relationship is created whenever an individual seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice." 63 Minn.L.Rev. 751, 759 (1979). A contract

analysis requires the rendering of legal advice pursuant to another's request and the reliance factor, in this case, where the advice was not paid for, need be shown in the form of promissory estoppel. *See,* 7 C.J.S., *Attorney and Client,* § 65; *Restatement (Second) of Contracts,* § 90.

5. As the *Cofran* court stated, in determining whether the jury's verdict is reasonably supported by the record a court must view the credibility of evidence and every inference which may fairly be drawn therefrom in a light most favorable to the prevailing party. 225 Minn. 42, 29 N.W.2d 450.

and John McNulty, contains sufficient evidence to support plaintiffs' position.

■ In a related contention, defendants assert that a new trial should be awarded on the ground that the trial court erred by refusing to instruct the jury that Miller's failure to inform Mrs. Togstad of the two-year statute of limitations for medical malpractice could not constitute negligence. The argument continues that since it is unclear from the record on what theory or theories of negligence the jury based its decision, a new trial must be granted. *Namchek v. Tulley*, 259 Minn. 469, 107 N.W.2d 856 (1961).

The defect in defendants' reasoning is that there is adequate evidence supporting the claim that Miller was also negligent in failing to advise Mrs. Togstad of the two-year medical malpractice limitations period and thus the trial court acted properly in refusing to instruct the jury in the manner urged by defendants. One of defendants' expert witnesses, Charles Hvass, testified:

Q  Now, Mr. Hvass, where you are consulted for a legal opinion and advice concerning malpractice and 14 months have elapsed [since the incident in question], wouldn't—and you hold yourself out as competent to give a legal opinion and advice to these people concerning their rights, wouldn't ordinary care and diligence require that you inform them that there is a two-year statute of limitations within which they have to act or lose their rights?

A  Yes.  I believe I would have advised someone of the two-year period of limitation, yes.

Consequently, based on the testimony of Mrs. Togstad, *i. e.*, that she requested and received legal advice from Miller concerning the malpractice claim, and the above testimony of Hvass, we must reject the defendants' contention, as it was reasonable for a jury to determine that Miller acted negligently in failing to inform Mrs. Togstad of the applicable limitations period.

Defendants also indicate that at the time Mrs. Togstad went to another attorney (after Miller) the statute of limitations may not have run and thus Miller's conduct was not a "direct cause" of plaintiffs' damages. As they point out, the limitations period ordinarily begins to run upon termination of the treatment for which the physician was retained.  *E. g., Swang v. Hauser*, 288 Minn. 306, 180 N.W.2d 187 (1970); *Schmidt v. Esser*, 183 Minn. 354, 236 N.W. 622 (1931). There is other authority, however, which holds that where the injury complained of consists of a "single act," the limitations period commences from the time of that act, even though the doctor-patient relationship may continue thereafter.  *See, e. g., Swang, supra*.  Consequently, the limitations period began to run on either August 29, 1971, the date of the incident in question, or October 6, 1971, the last time Dr. Blake treated Mr. Togstad.  Mrs. Togstad testified that she consulted another attorney "a year after [she] saw Mr. Miller." Thus, since she visited with Miller on October 2, or 3, 1972, if Mr. Togstad's injuries resulted from a "single act" within the meaning of *Swang, supra*, the limitations period had clearly run by the time Mrs. Togstad consulted another attorney.  If, as defendants argue, the statutory period commenced on the date of last treatment, October 6, and Mrs. Togstad's testimony is taken literally, she would have met with a different attorney at a time when perhaps three days of the limitations period remained.

■ Defendants' contention must be rejected for two reasons.  First, at trial defendants apparently assumed that the limitations period commenced on August 29, 1971, and thus did not litigate the instant issue below.  Accordingly, they cannot raise the question for the first time on appeal. *E. g., Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63 (Minn.1979); *Greer v. Kooiker*, 312 Minn. 499, 253 N.W.2d 133 (1977). Further, even assuming the limitations period began on October 6, 1971, it is reasonably inferable from the record that Mrs. Togstad did not see another attorney until after the statute had run.  As discussed above, Mrs. Togstad testified that she consulted a lawyer a year after she met with

Miller. This statement, coupled with the fact that an action was not brought against Dr. Blake or the hospital but instead plaintiffs sued defendants for legal malpractice which allegedly caused Mrs. Togstad to let the limitations period run, allows a jury to draw a reasonable inference that the statutory period had, in fact, expired at the time Mrs. Togstad consulted another lawyer. Although this evidence is weak, it constitutes a prima facie showing, and it was defendants' responsibility to rebut the inference.

■ There is also sufficient evidence in the record establishing that, but for Miller's negligence, plaintiffs would have been successful in prosecuting their medical malpractice claim. Dr. Woods, in no uncertain terms, concluded that Mr. Togstad's injuries were caused by the medical malpractice of Dr. Blake. Defendants' expert testimony to the contrary was obviously not believed by the jury. Thus, the jury reasonably found that had plaintiff's medical malpractice action been properly brought, plaintiffs would have recovered.

Based on the foregoing, we hold that the jury's findings are adequately supported by the record. Accordingly we uphold the trial court's denial of defendants' motion for judgment notwithstanding the jury verdict.

2. Defendants next argue that they are entitled to a new trial under Minn.R.Civ.P. 59.01(5) because the $39,000 in damages awarded to Mrs. Togstad for loss of consortium is excessive. In support of this claim defendants refer to the fact that Mr. and Mrs. Togstad were divorced in July 1974 (the dissolution proceeding was commenced in February 1974), and assert that there is "virtually no evidence of the extent of Mrs. Togstad's loss of consortium."

■ The reasonableness of a jury's damage award is largely left to the discretion of the judge who presided at trial and, accordingly, the district court's ruling on this question will not be disturbed unless a clear abuse of discretion is shown. *E. g.,*

*Bigham v. J. C. Penney Co.,* 268 N.W.2d 892 (Minn.1978). Or, as stated by the court in *Dawydowycz v. Quady,* 300 Minn. 436, 440, 220 N.W.2d 478, 481 (1974), a trial judge's decision regarding the excessiveness of damages will not be interfered with on appeal "unless the failure to do so would be 'shocking' and result in a 'plain injustice.'" In this case, we believe the trial court acted within its discretionary authority in ruling that Mrs. Togstad's damage award was not excessive.

■ "Consortium" includes rights inherent in the marital relationship, such as comfort, companionship, and most importantly, sexual relationship. *Thill v. Modern Erecting Co.,* 284 Minn. 508, 170 N.W.2d 865 (1969). Here, the evidence shows that Mr. Togstad became impotent due to the tragic incident which occurred in August 1971. Consequently, Mrs. Togstad was unable to have sexual intercourse with her husband subsequent to that time. The evidence further indicates that the injuries sustained by Mr. Togstad precipitated a dissolution of the marriage.[6] We therefore conclude that the jury's damage award to Mrs. Togstad finds sufficient support in the record.

■ 3. Defendants also contend that the trial court erred by refusing to instruct the jury that plaintiffs' damages should be reduced by the amount of attorney fees plaintiffs would have paid defendants had Miller prosecuted the medical malpractice action. In *Christy, supra,* the court was presented with this precise question, but declined to rule on it because the issue had not been properly raised before the trial court. The *Christy* court noted, however:

[T]he record would indicate that, in the trial of this case, the parties probably proceeded upon the assumption that the element of attorneys' fees, which plaintiff might have had to pay defendant had he successfully prosecuted the suit, was canceled out by the attorneys' fees plaintiff incurred in retaining counsel to es-

6. In *Dawydowycz v. Quady,* 300 Minn. 436, 220 N.W.2d 478 (1974), this court acknowledged

that evidence of difficulty in enduring a marriage constitutes proof of loss of consortium.

tablish that defendant failed to prosecute a recoverable action.

288 Minn. 174, 179 N.W.2d 307.

Decisions from other states have divided in their resolution of the instant question. The cases allowing the deduction of the hypothetical fees do so without any detailed discussion or reasoning in support thereof. *McGlone v. Lacey*, 288 F.Supp. 662 (D.S.D. 1968); *Sitton v. Clements*, 257 F.Supp. 63 (E.D.Tenn.1966), *aff'd* 385 F.2d 869 (6th Cir. 1967); *Childs v. Comstock*, 69 App.Div. 160, 74 N.Y.S. 643 (1902). The courts disapproving of an allowance for attorney fees reason, consistent with the *dicta* in *Christy, supra*, that a reduction for lawyer fees is unwarranted because of the expense incurred by the plaintiff in bringing an action against the attorney. *Duncan v. Lord*, 409 F.Supp. 687 (E.D.Pa.1976) (citing *Christy*); *Winter v. Brown*, 365 A.2d 381 (D.C.App. 1976) (citing *Christy*); *Benard v. Walkup*, 272 Cal.App.2d 595, 77 Cal.Rptr. 544 (1969).

We are persuaded by the reasoning of the cases which do not allow a reduction for a hypothetical contingency fee, and accordingly reject defendants' contention.

4. Finally, defendants assert that during closing argument plaintiffs' counsel violated Minn.R.Civ.P. 49 by commenting upon the effect of the jury's answers to the special verdict questions. Rule 49.01(1) reads, in pertinent part, that "[e]xcept as provided in Rule 49.01(2), neither the court nor counsel shall inform the jury of the effect of its answers on the outcome of the case." Rule 49.01(2) states: "In actions involving Minn. Stat.1971, Sec. 604.01 [the comparative negligence statute] the court shall inform the jury of *the effect of its answers to the percentage of negligence question and shall permit counsel to comment thereon * * *.*" (Emphasis added.) Thus, Rule 49 allows counsel to comment only upon the effect of the jury's answers to the percentage of negligence inquiries.

The statements of plaintiffs' counsel which are being challenged by defendants read as follows:

Now, this Special Verdict is not complicated, but it is a long one. The defense, of course, would like you to find 50 percent or more negligence on the part of my client. Again, whatever you put down in the damage verdict, doesn't mean anything, because he gets nothing. The Judge arrives at the conclusions of law when you answer these questions. *If you answer it, there is no causation. He gets nothing.*

(Emphasis added.) The first portion of the above comments is proper because it refers to the impact the jury's apportionment of negligence would have on the case. It is unclear, however, whether counsel's reference to causation is consistent with Rule 49. If counsel intended to disclose to the jury the effect the answers to the "direct cause" inquiries would have on whether plaintiffs recovered, then the statement violates Rule 49.

In any event, the question of whether the alleged Rule 49 violation entitles defendants to a new trial is a matter within the sound discretion of the trial court. *See, Patterson v. Donahue*, 291 Minn. 285, 190 N.W.2d 864 (1971). Here, the district court concluded that the purported improper comments of counsel did not require a new trial. In light of the ambiguous nature of counsel's statement, we hold that the trial court did not abuse its discretion in so ruling.

Affirmed.