**In re Petition for DISCIPLINARY ACTION AGAINST Walter G. PERRY, an Attorney at Law of the State of Minnesota.**

**No. C2–92–149.**

Supreme Court of Minnesota.

Dec. 31, 1992.

Marcia Johnson, Director of Office of Lawyers Professional Responsibility, Martin A. Cole, Sr. Asst. Director, St. Paul, for appellant.

Theodore J. Collins, Collins, Buckley, Sauntry & Haugh, St. Paul, for respondent.

PER CURIAM.

This case arises out of a petition filed by the Office of Professional Responsibility to

impose appropriate discipline on respondent, Walter G. Perry, for the misappropriation of trust funds that occurred during and after his tenure as trustee and attorney for his mother's trust fund known as the "EHWJ trust." Respondent was co-trustee with his mother, Helen Perry, who was also settlor. The terms of the trust indicated that it was to be used for the sole benefit of the settlor during her lifetime. Between November 1988 and January 1991 respondent concedes that he spent over $430,000 from the trust account on two yogurt franchises.

The referee ruled that respondent's conduct violated Minnesota Rules of Professional Conduct 1.4, 1.7(b) and 8.4(c). The referee found that respondent violated Rule 1.4 by failing to inform his mother of the conflict of interest that resulted from acting as her fiduciary and trustee of the EHWJ trust while appropriating substantial trust funds for his own benefit; respondent violated Rule 1.7(b) by not revealing this same conflict of interest and by acting as the trust's attorney in spite of the conflict; and respondent violated Rule 8.4(c) by engaging in various acts constituting dishonesty and misrepresentation, including pledging substantial trust moneys as collateral for a personal debt.

Respondent was admitted to the bar in New York in 1957. He came to Minnesota in 1983, was admitted to the Minnesota bar in 1986, and retired in 1988. Three years earlier, respondent's father, Edward J. Perry died. Edward was survived by his wife, Helen W. Perry, three sons and a daughter. In May 1987, using a New Jersey form book, respondent drafted the "EHWJ trust" for his mother. The language of the trust required that Helen Perry receive all of the net income of the trust in monthly installments. The trust also provided that in the event the

> Settlor [Helen Perry] should become incompetent or for any other reason be unable to act in her own behalf, Walter G. Perry [respondent] may in his absolute discretion pay to or apply for the benefit of the Settlor, in addition to the payments provided for her, such amounts from the principal of the trust estate, up to the whole, as said Trustee may from time to time deem necessary or advisable for her use and benefit.

Upon the death of the settlor, the trust estate was to be divided equally among the surviving children and the spouses of those children who predeceased the settlor. The trust was funded by Helen Perry and in October 1988, had a net worth of over $450,000. In the fall of 1988, Helen Perry attempted suicide. Thereafter, she lived first in a New Jersey nursing home and then with her daughter Helen Kendall in Kentucky. In July 1989, respondent brought his mother to Minnesota to live with his family.

Until her death in September 1991, Mrs. Perry lived in respondent's home for 370 days. The rest of the time was spent in hospitals and nursing homes. From March 1991 until her death, Mrs. Perry depended on public assistance and social security to pay for the care she received, since, by this time, the trust was void of any funds.

In late 1988, respondent and his wife Jeanne entered into an agreement with TCBY Enterprises, Inc. ("TCBY"), a franchisor of a national chain of frozen yogurt franchises, to become franchisees of an establishment known as Jeanne Marie's Yogurt. In November 1988 and June 1989, funds totaling $75,000 were transferred from the Prudential–Bache account that held the corpus of the trust to Jeanne Marie's Yogurt.

In 1989, respondent transferred trust moneys in the amount of $290,000 from the trust account. This money was pledged as collateral for respondent's personal loans from First National Bank of Cold Spring ("FNB") for the yogurt business. The franchises both closed in 1990. Consequently, respondent defaulted on the loans for which the trust funds provided security.

▪ The primary purpose of attorney discipline is not to punish the attorney but rather to protect the courts, the administration of justice, the legal profession and the public. *In re Serstock*, 316 N.W.2d 559, 561 (Minn.1982). The court must look at

four factors in deciding the appropriate discipline: 1) the nature of the misconduct; 2) the cumulative weight of the disciplinary rules violations; 3) the harm to the public; and 4) the harm to the legal profession. *In re Peters,* 474 N.W.2d 164, 168 (Minn.1991); *In re Isaacs,* 451 N.W.2d 209, 211 (Minn. 1990).

■ The supreme court is vested with the final responsibility for determining the appropriate sanctions in attorney discipline cases. *In re Isaacs,* 406 N.W.2d 526, 529 (Minn.1987). However, the referee's recommendation is accorded great weight by the court. *Id.*

■ The first issue we examine is whether, as respondent argues, Helen Perry consented to the use of her trust funds to finance respondent's foray into the yogurt business. The referee found that Helen Perry was not aware of the extent of the trust's investment in her son's business. The question of consent is undoubtedly one of fact and as such, should not be overturned unless "the appellate court is left with the definite and firm conviction that a mistake has been made." *Krmpotich v. City of Duluth,* 483 N.W.2d 55, 56 (Minn. 1992).

The referee was able to base his finding of non-consent on several grounds, including hospital records which indicated that Helen Perry asserted that her son had stolen her money. Most revealing, however, were statements made by respondent himself.

Respondent gave a sworn statement on November 13, 1991, at the Office of Lawyers Professional Responsibility. During the course of the statement, respondent testified that after his mother became unable to act in her own behalf, he made distributions of trust principal for his mother's benefit under the provision of the trust that allowed him to use his "absolute discretion."

Respondent also made or approved of pleadings in the course of other litigation that show he acted without his mother's consent. In February 1991, FNB brought a declaratory action in state court against the trust to retain the certificates of deposit in lieu of respondent's default. The trust's defense to this suit, used with approval of respondent, was that Helen Perry did not approve of the pledge of money from the trust account as collateral for respondent's personal debt. In a separate lawsuit brought by respondent against TCBY in federal court, respondent admitted that he pledged trust funds as collateral without the consent of his mother as required by the trust agreement.

Respondent's testimony and pleadings indicate a willingness to change his position depending on his situation. It is very difficult to conclude that the pleadings in either of these cases could have been miswritten in the manner respondent contends. The court, however, is not faced with this question. The standard of review is whether the referee's findings are clearly erroneous. It appears the referee's findings are consistent with the record.

■ As a separate defense, respondent contends that the referee should not have relied upon the statements contained in the two pleadings from other litigation, arguing that a party cannot be prejudiced by pleading inconsistent positions. He contends that pleadings which are inconsistent or hypothetical are primarily intended to give notice and that permitting them to be treated as admissions would thwart this purpose. *See* John W. Strong et al., *McCormick on Evidence,* § 257 at 150–52 (4th ed. 1992).

Given that inconsistent or hypothetical pleadings should not be used as admissions, respondent's argument is still unpersuasive. The pleadings in the litigation outside this attorney discipline action were neither hypothetical nor inconsistent with other portions of the pleadings themselves. The only inconsistencies present now are those between the pleadings in those cases and the positions respondent takes in the instant case. It is quite a stretch to allege that the inconsistent positions taken in a *single pleading* are due the same treatment as those in separate actions.

The Eighth Circuit articulated a rule in *Garman v. Griffin,* 666 F.2d 1156 (8th

Cir.1981), that applies to the present case. "Where a party has made a statement in a pleading about his own conduct which is at variance with his position in the matter being litigated, the evidence is generally admitted." *Id.* at 1158 (citing *Burdis v. Texas & Pacific Ry. Co.*, 569 F.2d 320 (5th Cir.1978)).

The *Garman* court also voiced its agreement with the Fifth Circuit's decision in *Continental Ins. Co. of New York v. Sherman*, 439 F.2d 1294 (5th Cir.1971), which stated:

> As a general rule the pleading[s] of a party made in another action * * * are admissible as admissions of the pleading party to the facts alleged therein, assuming of course that the usual tests of relevancy are met. Strictly applied, however, this rule would place a litigant at his peril in exercising the liberal pleading and joinder provisions of the Federal Rules of Procedure in that inconsistent pleadings under Rule 8(e)(2) could be used, in the proper circumstances, as admissions negating each other * * *. Thus, as a necessary exception to the general rule, there is ample authority that one of two inconsistent pleas cannot be used as evidence in the trial of the other.

(Citations omitted).

■ We adopt the general rule as articulated in *Sherman* and hold that while hypothetical and inconsistent pleadings within the same action should not be used as admissions in other lawsuits, pleadings that do not fall within these categories may be admitted as admissions in subsequent lawsuits if they are within the established bounds of relevancy. Respondent did not make inconsistent pleadings in litigation outside the instant action. They are fully consistent with themselves and with each other. Consequently, because respondent's pleadings were neither hypothetical nor inconsistent, the pleadings made in the other actions in which respondent was involved are admissible in this disciplinary action.

■ Next, we confront the question of whether an attorney-client relationship existed between respondent and his mother.

The answer to this question is very important, for if there was no attorney-client relationship, there could be no violation of Rules 1.4 and 1.7. The referee found an attorney-client relationship, but respondent contends that his relationship with his mother never went beyond that of a "biological fiduciary."

It is clear that respondent drafted the trust agreement, albeit from a New Jersey form book. It is also clear that he drafted several amendments to the trust, including one that made the trust irrevocable. Respondent also employed his legal judgment to ascertain which amendments were valid at what time, and what they meant. He drafted letters for his mother's signature to the court and counsel and also appeared at a hearing claiming to represent the interest of the trust. Finally, another statement of respondent comes back to haunt him: During the sworn statement, when asked whether there was any other attorney other than himself involved in the administration of the EHWJ trust, he answered in the negative.

In Minnesota, the question of whether an attorney-client relationship exists has often arisen in the context of legal malpractice cases. *See e.g., Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686 (Minn. 1980); *Ronnigen v. Hertogs*, 294 Minn. 7, 199 N.W.2d 420 (1972); *Christy v. Saliterman*, 288 Minn. 144, 179 N.W.2d 288 (1970). Two alternative models have been used to analyze this relationship: tort and contract. Both the *Ronnigen* and *Christy* courts used the contract model as a foundation for analysis. Under this model, there must be an express or implied agreement to hire the lawyer. *See e.g., Ronnigen* 294 Minn. at 11, 199 N.W.2d at 422. There was no express or implied contract between respondent and his mother that respondent would represent the trust. However, in *Togstad*, the court showed a willingness to look at the problem using a tort approach. *Togstad*, 291 N.W.2d at 693. The formulation of the test to determine whether under a *negligence* theory an attorney-client relationship exists is the following:

An attorney-client relationship is created whenever an individual seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice.

*Togstad,* 291 N.W.2d at 693, n. 4 (citing *Attorney Malpractice: Use of Contract Analysis to Determine the Existence of an Attorney–Client Relationship,* 63 Minn.L.Rev. 751, 759 (1979)).[1] Thus, looking at the issue from a negligence standpoint, whether an attorney-client relationship exists in this situation depends on whether the person seeking advice, Helen Perry, could reasonably rely on the advice given. There is little doubt that Mrs. Perry could reasonably rely on the advice of her son with regard to the trust agreement, the amendments to the trust and the letters to counsel. So, the real issue to be addressed to determine the existence of an attorney-client relationship under a negligence theory is whether what respondent did in drafting these documents and appearing in court claiming to represent the trust amounted to legal advice. We believe that they do. Such services are commonplace in the legal community.

Accordingly, we conclude that respondent acted as an attorney for his mother and the trust, and the conclusion of the referee should not be overturned.[2]

We now come to respondent's request for a new hearing. This request is based on the assertion that the Director mishandled the taking of the sworn statement given by respondent on November 13, 1991. Respondent asserts that the Director told him it would be better if respondent waived his right to read the transcript. Respondent also argues that he was not aware that his credibility was at issue at the hearing. These contentions are belied by an examination of the transcript of the hearing. Neither assertion is sufficient to grant a new hearing.

The referee found disbarment an appropriate sanction under the circumstances. However, the mitigating factors in this case are substantial. Respondent brought his mother into his home on very short notice at a time when he was under the stress of attempting to develop a new business to support his family. He provided the only environment in which his mother enjoyed any degree of happiness in the final years of her life. Respondent has been a member of the bar for over 35 years and has no previous disciplinary record. Further, respondent fully cooperated with the Board throughout its investigation. Finally, respondent has shown remorse for his actions. These mitigating factors, coupled with the fact that the complaint upon which the proceeding was based was not a party injured by the loss of the trust funds, dictates a penalty short of disbarment. Therefore, we hereby order that respondent be suspended indefinitely with no possibility of reapplication for five years.

---

1. It should be noted that the court in *Togstad* did not explicitly employ this formulation in that case. *Id.* at 693. However, it has been subsequently used by the court of appeals. *See e.g., Virsen v. Rosso, Beutel, Johnson & Rosso,* 356 N.W.2d 333, 336 (Minn.Ct.App.1984).

2. Even if no attorney-client relationship were found, respondent would still be subject to discipline under Rule 8.4. This court has stated in no uncertain terms that ethical rules bind attorneys in all that they do, professional and otherwise. *See In re Scallen,* 269 N.W.2d 834, 841–42 (Minn.1978).