[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff seeks to foreclose[1] on a mortgage dated August 20, 1987 that was given to secure a $60,000. This was the last of six mortgage transactions wherein the plaintiff lent money to Barbara Roth ("Roth") twice and to the defendant four times.
By way of special defense, the defendant alleges that:
1. Jerome Goldman, a principal of the plaintiff and the plaintiff's closing attorney for each of the six mortgages, was also the attorney for Barbara Roth and the defendant in each of the transactions;
2. Goldman knew that all of the borrowed funds were to be transferred to Nicholas A. Attick, Sr. and his related corporations;
3. Goldman had represented Attick and his related corporations and knew that they were not credit-worthy;
4. Goldman breached his fiduciary duty to Roth and the defendant by not disclosing that credit information to them;
5. the failure to disclose the credit information caused Roth and the defendant to enter into the mortgage transactions when they would not have done so if they had had the benefit of full disclosure from Goldman;
6. the breach of fiduciary duty caused the defendant financial loss; and,
7. Goldman's conduct in giving evasive answers to Roth's CT Page 1353-LL inquiries as to whether she needed a lawyer for these transactions constitutes inequitable conduct that taints the mortgages and precludes foreclosure.
The court finds that the special defense has not been proven and finds that the defendant is liable on the note.
The following facts were not in dispute. The first two mortgages were executed on October 22, 1984 and February 8, 1985. Barbara Roth was the mortgagor in each of those transactions. The next four mortgages were executed on May 30, 1985, August 20, 1985, February 3, 1986 and August 20, 1987 respectively. The defendant corporation was the mortgagor in the last four transactions. The subject Westport property, previously owned by Barbara Roth individually and transferred to the defendant corporation as part of the third transaction, secured all six mortgages. The incorporation papers for the defendant BNA were also executed at the closing of May 30, 1985. Goldman, at the time of all of the transactions, was a principal of the plaintiff corporation and the plaintiff's closing attorney in each of the transactions Goldman was aware at all relevant times that Attick had been convicted of fraud and that Attick and his corporations were not good credit risks.
The linchpin of the special defense is the claim that Goldman in fact represented Roth and BNA in all of the transactions as well as the plaintiff The defendant claims that Goldman had a duty to disclose the negative credit information about Attick to the defendant and Roth In the alternative, the defendant claims that if Goldman was not the attorney for Roth and the defendant, Goldman's evasive answers to Roth's inquiries about whether she needed counsel in the transactions constituted inequitable conduct that precludes foreclosure of the mortgages.
The defendant claims that an attorney-client relationship was established between Goldman and Roth and Goldman and BNA by the conduct of the parties in the six transactions. Those transactions, except for the third closing that involved the incorporation of the defendant, will be discussed together.
In each of the transactions, the defendant claims that Goldman represented it and Roth because Goldman gave allegedly evasive answers to Roth's inquiries as to whether she needed an attorney. The answers given by Goldman consisted of statements to CT Page 1353-MM the effect that he never told people not to get attorneys, Roth could get an attorney if she wanted, and closing of the mortgage loan could be postponed for Roth to get an attorney. The defendant contends that these answers were evasive because Goldman knew that Roth needed an attorney because the funds were going to Attick. The defendant asserts as a legal proposition that when a person asks a lawyer if he or she needs an attorney, that person is seeking legal advice and any answer that the lawyer gives constitutes legal advise and, therefore, creates an attorney-client relationship. The defendant posits that refusing to answer was the only way Goldman could have avoided creating an attorney-client relationship when Roth inquired about counsel.
The defendant cites no authority in support of the proposition that any answer to the question "do I need a lawyer?" creates an attorney-client relationship between the questioner and the responding attorney. The cases that the defendant cites all involve either the preparation of a legal document, giving advice even though abbreviated, assessing the merits of a case or engaging in legal consultation. Westport Bank and Trust v.Corcoran, Mallin Aresco, 221 Conn. 490 (1992), was a case wherein the attorney actually rendered a legal service to a bank by issuing it a certificate of title at the bank's request. The supreme court held that the attorney entered into an attorney-client relationship with the bank even though the bank did not pay him and the attorney did not intend to enter into such a relationship. In Sammartino v. Planning Zoning Commission,39 Conn. Sup. 138 (1983), an attorney-client relationship with the plaintiff was created where an attorney gave legal advice to the plaintiff's attorney. In Togstead v Vesely, Otto, Miller Keefe, 291 N.W.2d 686 (Minn. 1980), the attorney-client relationship was created by words of opinion and promise ("I don't think there's a case but I'll check further"). A lawyer's advice to a client, whom he represented on a criminal case, to take his civil case to small claims court was considered sufficient advice to establish the attorney-client relationship in Teja v. Saran,847 P.2d 1375 (Wash. 1993).
The reasoning of these cases cannot be stretched to support the broad proposition that the defendant advances here. In each of the five transactions the court finds that Goldman explained to the defendant and Roth that he was representing the plaintiff only and that he was not counsel to Roth. To the extent that the inquiry could be considered to be one by Barbara Roth as president of the defendant, the court finds that Goldman did not become the CT Page 1353-NN attorney for the corporation by his answers.
On May 30, 1985, Goldman did prepare certain documents to incorporate the defendant and he also prepared a quitclaim deed of the Westport property from Roth to the defendant. Roth became the president and sole stockholder of BNA. The court finds that the evidence establishes that the defendant corporation was formed because of Roth's privacy concerns over her name appearing in the commercial record with respect to the transactions. The court further finds that Goldman's representation was for the purpose of forming the corporation and transferring the Westport property to it and for no other purposes. The defendant and Roth waived their right to representation in each of the transactions as established by the exhibits and the evidence.
Even if Goldman could be considered the attorney for Roth and BNA in all of the transactions, the court finds that the following facts demonstrate that any failure to disclose information about Attick played no part in the decision by Roth and the defendant to transfer the borrowed funds to Attick. Roth had transferred at least $550,000 to Attick and his corporations before the first transaction with the plaintiff. In total, Roth transferred $950,000 to Attick or entities under his control in addition to the $795,000 borrowed as a result of the six mortgage transactions at issue here In addition, Roth guaranteed a $250,000 loan from the then Citytrust Bank to Attick. The total of $1,745,000 transferred to Attick was an investment in Attick's ventures by which Roth expected to double her money Roth never investigated Attick and no documents were ever signed in connection with the transfer of these funds to Attick's control. Roth transferred all of her funds to Attick and his entities and borrowed funds from the plaintiff for transfer to Attick. In return Attick periodically gave her money for her living expenses. Attick was contributing towards Roth's living expenses up to the time of trial. Attick is a close friend and business advisor to Roth and Roth has not brought suit against or made any claim of any kind against Attick, although none of her investments have yielded any return.[2]
Roth holds a bachelor's degree from Hofstra University and took some business courses in college. Roth testified that she would never have transferred any money to Attick or his entities if she had known of his conviction for fraud and his poor credit standing. The court does not find that testimony to be credible. Roth's very close friendship with Attick and her complete reliance CT Page 1353-OO on him in financial matters was such that information regarding Attick's credit standing and fraud conviction would not have deterred her from giving him whatever funds she had or could borrow. She transferred over half a million dollars of her own funds to Attick within two or three months of meeting him without any investigation, documentation or legal advice. She did exactly what Attick told her to do in financial matters. The court notes that Roth makes no claim that Attick defrauded her in any way. Roth's testimony that she did not know about the poor credit standing of Attick and his related corporations is also not credible. The very fact that Attick needed to use Roth to borrow the money, instead of borrowing it himself, was a sufficient indication to a person of average intelligence that Attick was not sufficiently credit-worthy to borrow such funds.
Lastly, the court finds that the conduct of the plaintiff was not inequitable. The defendant claims that Goldman's "evasive" answers to Roth's inquiries prior to each transaction as to whether she needed a lawyer constituted inequitable conduct. The court finds that Goldman's answers were not evasive or inequitable; rather, Goldman simply left it up to Roth whether she wanted an attorney and Goldman would have postponed each transaction for her to obtain counsel, had Roth chosen to do so In addition, Roth relied solely on Attick's advice in entering into the subject transactions. Even after Goldman advised Roth in writing on the date of the third transaction that he had not advised her to "re-lend these funds to Mr. Attick and you should have your own attorney representing you in that transaction", Roth persisted in transferring the borrowed funds from the last four closings to Attick and his entities.
The court finds that the defendant is liable on the note and has defaulted. The court further finds that the allegations of the special defenses have not been proven. The plaintiff may claim the case for the foreclosure short calendar to complete the proceedings necessary for a judgment of foreclosure.
SPEAR, J.