In re Petition for DISCIPLINARY ACTION AGAINST John E. MacGIBBON, an Attorney at Law of the State of Minnesota.

No. C3–93–1899.

Supreme Court of Minnesota.

Aug. 18, 1995.

Marcia A. Johnson, Director, Lawyers Professional Responsibility Bd., Patrick R. Burns, Sr. Asst. Director, St. Paul, for petitioner.

John E. MacGibbon, Elk River, pro se.

## OPINION

PER CURIAM.

At the direction of a panel of the Lawyers Professional Responsibility Board, the Director of the Office of Lawyers Professional Responsibility filed with this court a petition for disciplinary action against John E. MacGibbon. The petition for disciplinary action relates to MacGibbon's alleged neglect in administering the estate of Axel Hjalmer Anderson. From January 8, 1964 to April 10, 1981, MacGibbon acted as the attorney to the personal representative of Anderson's estate. Beginning on September 14, 1981, MacGibbon served as successor personal representative of Anderson's estate. On January 29, 1993, MacGibbon filed a statement to close Anderson's estate.[1] The petition for disciplinary action alleged that MacGibbon violated Minnesota Code of Professional Responsibility DR 6–101(A)(3) and DR 7–101(A) and Rules 1.3 and 3.2 of the Minnesota Rules of Professional Conduct.

After a hearing on the petition, the referee filed with this court its Findings of Fact, Conclusions of Law, and Recommendation. The referee concluded that MacGibbon's failure to promptly and diligently administer the estate of Axel Anderson violated both the Code and the Rules, and the referee recommended that MacGibbon be publicly reprimanded and be removed as personal representative of Axel Anderson's estate, with a successor personal representative appointed to conclude this matter. The referee further recommended that MacGibbon pay costs to the Director pursuant to Rule 24, Rules on Lawyers Professional Responsibility. We conclude that MacGibbon's performance in administering Axel Anderson's estate after 1986 constitutes neglect in violation of Rules 1.3 and 3.2 of the Minnesota Rules of Profes-

1. At the hearing on the petition for disciplinary action, MacGibbon stated that he had attempted to cancel the letter terminating the statement to close the estate, explaining that the estate could then retain the authority to sell the estate's remaining asset, a 68–acre parcel of real estate.

sional Conduct, and we agree with the referee's sanction recommendation.

### I.

Axel Hjalmer Anderson, a resident of Sherburne County, Minnesota, died intestate on January 7, 1964. Axel Anderson's death certificate indicates that he had never been married and that his parents' names were unknown. At the time of his death, Axel Anderson owned approximately 280 acres of farmland worth approximately $9,000, and personal property in the form of bonds worth less than $5,000. According to MacGibbon, "no estate of consequence" existed during the first eight years following Axel Anderson's death because funeral expenses, claims against the estate and delinquent real estate taxes more than exhausted available funds.

On January 17, 1964, MacGibbon, on behalf of Chester J. Goenner, filed a petition for the administration of Axel Anderson's estate. The petition originally indicated that no heirs were known to exist. Sometime later, however, someone wrote on the petition the names of two potential heirs: Mrs. E.A. Woods, a sister living in Ashland, Oregon, and Andrew Anderson, a brother living in Los Angeles, California. Goenner, who had been Axel Anderson's guardian during the three years preceding Anderson's death, was appointed administrator.[2] MacGibbon served as an attorney for Goenner.[3]

MacGibbon testified that, during the period from Axel Anderson's death until 1980, the estate's primary concern was attempting to sell the real estate. Because the estate was virtually insolvent, MacGibbon testified that the real estate needed to be sold before nonexistent funds were spent in search of heirs.

MacGibbon assisted Goenner in selling two parcels of the real estate to Northern States Power (NSP) at a price considerably higher than the $9,000 value of the land that had been estimated at the time of Axel Anderson's death.[4] In 1972, the first parcel sold for $26,000. This sale apparently generated a market for the second parcel. NSP initially expressed an interest in trading a parcel of property it owned for the estate's second parcel. On the advice of MacGibbon, however, Goenner refused NSP's offer to trade, and in 1980, NSP purchased the second parcel from the Anderson estate for $78,000. A third parcel of real estate, consisting of 68 acres, had been listed with Edina Realty since October 1992, and in his brief to this court, MacGibbon declared that he was finally able to sell this parcel on behalf of Anderson's estate.

As the attorney for Goenner, the personal representative of the Anderson estate, MacGibbon received and responded to correspondence relating to the estate from, among others, Judge Rainer L. Weis and Judge Roger M. Klaphake. In a letter to MacGibbon dated March 1, 1978, Judge Klaphake listed eight estates, including the Anderson estate, that had been "open"[5] for more than 18 months. Judge Klaphake urged MacGibbon to set a date for closing. In a letter to MacGibbon dated June 19, 1978, Judge Weis listed the same eight estates and urged MacGibbon to act immediately to close the estates, stating,

> If these estates are not closed or an appropriate explanation given to the Court by the next time I am in Elk River, I am going to write to each representative and order him to show cause why he should not be removed and a new administrator ap-

---

**2.** After the adoption of the Uniform Probate Code in 1975, the title terminology changed to personal representative.

**3.** MacGibbon was admitted to practice law in Minnesota in 1948, and from 1955 until 1990, MacGibbon served as Sherburne County Attorney. At the time of Axel Anderson's death, Goenner was the Sheriff of Sherburne County, and he served as sheriff until his own death in 1981.

**4.** MacGibbon did not receive payment for the services he provided to Goenner until 1981,

when he received a portion of the balance due, plus interest.

**5.** Throughout these disciplinary proceedings, MacGibbon has contended that the Anderson estate is not "open." Because the Anderson estate is an unsupervised estate under the Minnesota Probate Code, adopted in 1975, MacGibbon contends that no case is open and proceeding before the court. The term "open" appears to have been used throughout these proceedings to indicate that assets remain undistributed from the Anderson estate.

pointed * * * who will see that these estates are closed.

On November 20, 1978, on behalf of Goenner, MacGibbon petitioned for an extension of "six (6) months" within which to settle Anderson's estate. The petition explained that Goenner had an opportunity to sell a parcel of the real estate that remained in the estate, and consequently, the estate would benefit by an extension. In a letter dated July 13, 1979, MacGibbon advised Goenner to "make some plans for the ultimate closing of the estate, including the disposition of the remaining real estate." MacGibbon testified that he had advised Goenner of his responsibilities and had encouraged Goenner several times "to try to move this thing along." But Goenner reportedly responded that he thought the best procedure would be to wait to distribute the assets of the estate until the real estate had been sold. On March 19, 1980, on behalf of Goenner, MacGibbon filed a second petition for an extension of time in which to settle Anderson's estate.

In a letter to MacGibbon dated January 15, 1981, Judge Weis commended MacGibbon on his performance in closing old estates, but suggested that MacGibbon close the Anderson estate, which remained "open."

On April 10, 1981, Goenner died. Although the probate code provided that the state could accept the assets of an estate whose distributees could not be located, MacGibbon "felt" that that alternative "would not have been in the best interest of the distributees, the people that I believe were entitled to the land, if they could only establish that entitlement." Consequently, because no interested parties petitioned the court to become successor personal representative of Axel Anderson's estate, MacGibbon petitioned to be appointed to the position, and on September 14, 1981, MacGibbon was formally appointed successor personal representative to Axel Anderson's estate.

MacGibbon testified that, after he was appointed personal representative of Axel Anderson's estate, he wanted to discover what the Anderson estate consisted of before beginning his search for heirs. Because Goenner "had been his own advisor as to money, as to investments, [and] as to taxes," MacGibbon did not have access to all the information possessed by Goenner relating to the Anderson estate. Thus, MacGibbon testified that his search for Anderson's heirs was delayed by the 18–month administration of Goenner's estate. MacGibbon indicated that, once he had accounted for the assets of Anderson's estate, his focus became the search for heirs.

It was discovered that Axel Anderson had four siblings: a brother named Noven, who predeceased Axel, leaving no descendants; a brother named Per (or Par) Anderson, who predeceased Axel on April 28, 1935; a brother named Andrew (or Anders) Anderson, who died in California on May 8, 1964; and a sister named Adel Anna Anderson Woods, who died in Oregon on February 9, 1964.

MacGibbon's search for heirs was directed toward searching three lines of heirship: (1) the descendants of Adel Woods, sister, who had three sons, later identified as: Marcus Woods, who died on September 20, 1982, survived by a widow and three daughters; Harvey Woods, who died in 1989, survived by a widow; and Clarence Woods; (2) the descendants of Per Anderson, brother, who were thought to be Sigfried, deceased in March of 1959 without children, and Ernest, deceased in July 1953, who had been married to Lorene Chalk and had one child, Beverly Proctor; and (3) the descendants of Andrew Anderson, brother, who were thought to be limited to a widow, Frieda Anderson, who died in 1969.

On June 27, 1984, MacGibbon wrote to Harvey Woods, who lived in Ashland, Oregon, notifying Woods that he was attempting to locate the heirs of Axel Anderson. In a letter dated September 19, 1984, MacGibbon requested information on heirs of Harvey's brother, Marcus Woods. In response, Harvey Woods provided the names and dates of birth for the descendants of Marcus Woods. This information confirmed the details concerning distribution to the descendants of Adel Woods.

In a letter dated November 9, 1984, MacGibbon informed Harvey Woods that he was attempting to locate Lorene Chalk, who was married to Ernest Anderson, son of Per, and was also attempting to locate Chalk's daughter, named Beverly Proctor. MacGib-

bon also indicated that he had shown the 68–acre parcel of land remaining in the Axel Anderson estate to several people, but none of them had indicated an interest in purchasing it.

In a response letter, Harvey Woods expressed his appreciation to MacGibbon for what MacGibbon had done to settle Axel Anderson's estate. Woods indicated that the attorney for Andrew Anderson's estate was unable to locate either Ernest or Sigfried, and he was unaware that Beverly Proctor existed.

After unsuccessful attempts to contact Beverly Proctor by mail, MacGibbon went to California in February 1985 and located Proctor. Proctor informed MacGibbon of the address of her mother, Lorene Chalk. On March 7, 1985, MacGibbon wrote to Lorene Chalk requesting her assistance in obtaining documentary evidence that would support her right to distribution from the Axel Anderson estate. In a letter dated March 12, 1985, to support her right to distribution, Lorene Chalk provided MacGibbon with documentary evidence in the form of an affidavit given in 1966 in conjunction with the probate of Andrew Anderson's estate.

Thus, by the end of March 1985, MacGibbon had identified the descendants of Adel Woods and the descendants of Per Anderson, two of the three heirship lines entitled to distribution from Axel Anderson's estate. The descendants of Andrew Anderson constituted the only heirship line remaining unidentified. Andrew Anderson's descendants represent the third of three heirship lines entitled to distribution from Axel Anderson's estate. The entitlement of this third heirship line was in doubt, so MacGibbon established a trust to represent these potential interests.[6]

On July 1, 1985, MacGibbon apparently wrote to all known heirs of Axel Anderson's estate. These letters identified the assets of the estate and provided a tentative proposal for distribution of the assets. Apparently, the heirs all desired that the parcel of land be sold, with the proceeds being distributed, instead of each retaining an undivided interest in the property. In their letters, the heirs thanked MacGibbon for his concern in closing Axel Anderson's estate. Beverly Proctor wrote, "I am grateful for this apparent good fortune and would be most pleased to be briefly informed as to how my great-uncle acquired this sizable estate."

Because no immediate market existed for the remaining parcel, MacGibbon was concerned that satisfying the heirs' desire to liquidate the land would entail keeping the estate open "longer than otherwise would be prudent * * *." He communicated this concern to Harvey Woods both in a letter dated July 18, 1985 and in person during a visit to Oregon.

Before Goenner died, Goenner apparently deposited the proceeds from the two sales of Axel Anderson's real estate into a certificate of deposit. In September 1985, after the certificate of deposit matured, MacGibbon began distributing from the Anderson estate to the known heirs. MacGibbon distributed approximately $77,000, dividing the amount into three equal shares for each heirship line identified. In June 1986, MacGibbon made a second distribution from the Anderson estate.

After this second distribution, the record lacks evidence of any written correspondence until 1989. Similarly, MacGibbon's reconstructed time records reflect that the period between the second distribution and 1989

---

**6.** Through various correspondence, MacGibbon believed that Frieda Anderson, widow of Andrew Anderson, had a daughter named Edna Nearon, whose last known address was in Higginsville, MO. In a letter sent to Higginsville dated April 10, 1985, MacGibbon asked Edna Nearon to explain her relationship to Andrew Anderson. Nearon did not respond to this inquiry. Because MacGibbon's attempts to contact Nearon by mail were unsuccessful, MacGibbon travelled to Higginsville personally to search for her.

MacGibbon learned that Nearon had died on January 14, 1981, having no children. Although MacGibbon's search was unsuccessful, soon after he returned to Minnesota, he received a letter from a woman named Edna Marie Stoll. Stoll informed MacGibbon that Nearon was her aunt, born in Lincoln, Nebraska. Stoll indicated that Nearon was one of two children of Frieda Anderson and Johann Wilhelm Christian Gross. Nearon's brother was named Walter Theodore Gross. Walter Gross was Stoll's father. Apparently, Johann was Frieda's first husband. After he died, Frieda married a man named McClure. After McClure died, Frieda married Andrew Anderson.

was one of little activity relating to the Axel Anderson estate.

In 1989, Harvey Woods died.

In a letter to MacGibbon dated February 22, 1989, the Sherburne County court administrator asked MacGibbon to file a final account and a petition for discharge by May 1, 1989. On September 19, 1990, Judge Dale E. Mossey issued to MacGibbon an order to show cause why the Anderson estate had not been closed. On October 26, 1990, Judge Mossey held a hearing on the order to show cause, and granted MacGibbon an additional year within which to settle the Anderson estate. But in a letter to MacGibbon dated November 9, 1990, Judge Mossey asked MacGibbon to respond in writing to whether MacGibbon could "assure me that this estate can be properly closed within one year?"

In a letter dated December 6, 1990, MacGibbon informed Judge Mossey that he was "in the process of addressing the concerns that you have expressed in your inquiry of November 9, 1990." MacGibbon surmised that his "response should be complete by December 22, 1990." On January 17, 1991, MacGibbon conversed with the Sherburne County court administrator, orally responding to many of the concerns raised in Judge Mossey's November 9, 1990 inquiry. In a written memo dated January 31, 1991, the court administrator communicated MacGibbon's oral responses to Judge Mossey.

MacGibbon did not make a third distribution from the Anderson estate until 1992. On January 29, 1993, MacGibbon filed a statement to close Anderson's estate, and on March 29, 1993, MacGibbon filed a supplementary final account. The supplementary final account indicates that since 1985, over $181,000 in cash has been distributed either to heirs directly or to the trust established for Andrew Anderson's descendants. At oral argument, MacGibbon informed this court that the 68-acre parcel of land has recently been sold for $34,500, comprised of a $5,000 downpayment and a purchase money mortgage covering the balance.

Also at oral argument, MacGibbon declared that he considered the Anderson estate to be a "trophy" estate. MacGibbon explained his sentiments by stating that the Anderson estate began with assets of little value and no known heirs, and ended with a significant increase in asset value being distributed to heirs who otherwise might not have been identified. No heir to Axel Anderson's estate has formally complained of MacGibbon's handling of the estate. It is unclear whether assets from Axel Anderson's estate remain undistributed, and it is unclear whether the estate remains "open."

## II.

The petition for disciplinary action alleged that MacGibbon had violated Minnesota Code of Professional Responsibility DR 6–101(A)(3) and DR 7–101(A) (governing conduct occurring on or before August 31, 1985) and Rules 1.3 and 3.2 of the Minnesota Rules of Professional Conduct (MPRC) (governing conduct occurring after August 31, 1985). Generally, these Code provisions and Rules impose professional discipline on attorneys for neglecting client matters and for intentionally failing to fulfill the lawful objectives of a client.

Disciplinary Rule 6–101(A)(3) provides that a lawyer shall not neglect a matter entrusted to him. Disciplinary Rule 7–101(A) provides in pertinent part:

(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, * * *.

(2) Fail to carry out a contract of employment entered into with a client for professional services, * * *.

(3) Prejudice or damage his client during the course of the professional relationship, * * *.

Rule 1.3, MRPC, provides that "A lawyer shall act with reasonable diligence and promptness in representing a client." Rule 3.2, MRPC, provides that "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

Although we do not condone MacGibbon's performance as attorney to the personal representative during the first 17 years following Anderson's death, we question whether it is appropriate to attribute to MacGibbon any

alleged neglect by Goenner. During the first 17 years following Axel Anderson's death, MacGibbon was not the personal representative. Rather, he was an attorney to the personal representative. As attorney to the personal representative, MacGibbon apparently encouraged his client, Goenner, to close the Anderson estate. Goenner failed to heed MacGibbon's urging.

In 1981, MacGibbon was appointed successor personal representative for Axel Anderson's estate. Because access to Goenner's documents was limited, MacGibbon apparently had to wait until the 18–month administration of Goenner's estate was complete before he could assemble the assets of Axel Anderson's estate. Thus, it appears that during the period following Goenner's death, MacGibbon was confined in his administration of Axel Anderson's estate.

Following that delay, through 1986, it appears that MacGibbon worked with reasonable diligence in attempting to establish Axel Anderson's heirs. Part of the success of MacGibbon's search is evidenced by the two distributions occurring in September 1985 and in June 1986. The value of those distributions far exceeds the value of the estate at the time of Axel Anderson's death. Further, contrary to the contention of the Director, it does appear that this increase in value was in part due to the efforts of MacGibbon and Goenner.

We conclude that MacGibbon did not neglect the administration of Axel Anderson's estate in violation of DR 6–101(A)(3). Moreover, the record provides little, if any, support for the conclusion that MacGibbon intentionally failed to fulfill the lawful objectives of a client in violation of DR 7–101(A).

■ The period from 1987 to 1992 reveals that MacGibbon's efforts to establish heirs became less concerted after the second distribution from Axel Anderson's estate. Perhaps this can largely be explained by recognizing that most of the heirs had been established. The delay was primarily due to the uncertainty as to whether Andrew Anderson had any descendants who were entitled to receive a distribution from Axel Anderson's estate. But the probate code has mechanisms for resolving such confusion. For example, MacGibbon could have sought and obtained an order determining heirs and adjudicating the final settlement and distribution of the estate. See Minn.Stat. § 524.3–1001.

Although no heirs or persons interested in Axel Anderson's estate have complained about MacGibbon's administration, and although the value of the estate has significantly increased since Axel's death, this estate could have been settled in 1986, soon after the second distribution.

After this second distribution, the record lacks evidence of any written correspondence until 1989. Similarly, MacGibbon's reconstructed time records reflect that the period between the second distribution and 1989 was one of little activity relating to the Axel Anderson estate. In addition, Harvey Woods, a known heir, died in 1989. On January 29, 1993, MacGibbon finally filed a statement to close Anderson's estate, and on March 29, 1993, MacGibbon filed a supplementary final account.

We conclude that MacGibbon's performance in administering Axel Anderson's estate after 1986 constitutes neglect in violation of Rules 1.3 and 3.2 of the Minnesota Rules of Professional Conduct. MacGibbon's neglect exacerbated the delays that are inherent in the process of probate administration. We now must decide what discipline is appropriate.

■ This court has the final responsibility for determining what sanction is appropriate in attorney discipline cases. The purposes of attorney discipline are "to protect the courts, the legal profession and the public, guard the administration of justice and deter similar misconduct." In re Isaacs, 451 N.W.2d 209, 211 (Minn.1990). In determining an appropriate disciplinary sanction, this court considers the nature of the misconduct, the cumulative weight of disciplinary violations, the harm to the public and the harm to the legal profession. In re Jagiela, 517 N.W.2d 333, 335 (Minn.1994). In deciding what discipline is appropriate, this court affords great weight to the referee's recommendation. In re Perry, 494 N.W.2d 290, 293 (Minn.1992).

"Perhaps no professional shortcoming is more widely resented than procrastination."

Comment to Rule 1.3, MRPC. In *In re Braseth*, 352 N.W.2d 22, 23 (1984), this court stated:

> This court has long considered neglect in probating estates as serious professional misconduct. We have disbarred attorneys for persistent neglect of probating estates. *In re Streater*, 262 Minn. 538, 115 N.W.2d 729 (1962); *In re Gennow*, 206 Minn. 389, 289 N.W. 887 (1939). We have likewise indefinitely suspended attorneys for probate neglect. *In re Johnson*, 312 N.W.2d 676 (Minn.1981); *In re Odell*, 296 Minn. 514, 207 N.W.2d 528 (1973).

In the present case, the referee recommended that MacGibbon be publicly reprimanded and be removed as personal representative of Axel Anderson's estate. The referee further recommended that MacGibbon pay costs to the Director pursuant to Rule 24, RLPR. We recognize MacGibbon's long history of public service, and we note MacGibbon's advancing age and relatively unblemished professional career.[7] Nevertheless, we conclude that the referee's recommendation is the appropriate sanction.

John MacGibbon is to be removed as personal representative to the estate of Axel Anderson, and a successor personal representative is to be appointed and is instructed to conclude this matter. A public reprimand is ordered, with costs to be paid by MacGibbon pursuant to Rule 24, RLPR.

TOMLJANOVICH, J., took no part in the consideration or decision of this case.

COYNE, Justice (concurring specially).

Although I concur in the sanction imposed by the majority—a public reprimand, removal of John MacGibbon as personal representative in the Estate of Axel Anderson, and costs of $750 awarded to the Director pursuant to Rule 24, RLPR—I cannot agree that

MacGibbon was not guilty of neglecting Axel Anderson's estate prior to 1986.

The Estate of Axel Anderson has remained unsettled from Anderson's death on January 7, 1964 until, at least, February 14, 1994, when the referee issued his findings of fact, conclusions of law, and recommendation of public reprimand.[1] To put it a slightly different way, this estate has remained in probate for more than 30 years. It is true, of course, that the estate has increased in value from its 1964 valuation of about $14,000 to about $260,000. That increase is not, however, the result of skillful investment by Mr. MacGibbon; it is simply the result of the increase over time in the value of the land held in the estate.

Undoubtedly, the fact of the monumental increase in the value of the estate has forestalled any complaint by the recipients of the proceeds of Axel Anderson's estate. Indeed, the distributees of those proceeds are hardly in any position to complain of delay, for it is the delay in settling the estate which has made them heirs. Two of Axel Anderson's four siblings survived him, but both of them died within 6 months of Axel's death. Axel's sister, Adel Woods, who died February 9, 1964, was survived by three sons: Marcus, Harvey, and Clarence Woods. Andrew Anderson, Axel's brother who died on May 8, 1964, was survived by his widow, Frieda Anderson, who died in 1969. Per Anderson, one of the brothers who predeceased Axel had two sons, Sigfried and Ernest, both of whom also died before Axel's death. Axel's third brother, Noven, who also predeceased Axel, left no descendants.

Two of Adel Woods' three sons have since died: Marcus died on September 20, 1982, survived by a widow and three daughters; and Harvey Woods died in 1989, leaving a widow. Per Anderson's son Ernest was sur-

---

7. On May 11, 1990, in a matter unrelated to the administration of Axel Anderson's estate, MacGibbon was issued an admonition for failing to act with diligence in probating an estate, in violation of Rule 1.3, Minnesota Rules of Professional Conduct. This is the only discipline MacGibbon has received for professional misconduct.

1. As the majority opinion points out, MacGibbon filed a closing statement in the estate on January

29, 1993. During the hearing before this court, MacGibbon said that he had attempted to retract the closing statement in order to permit the estate to sell the 68–acre parcel of land, which is the estate's only remaining asset. The record in these proceedings does not reveal whether the estate has finally been settled. Since, however, MacGibbon did not claim that the estate has been closed on the probate court's books, I assume that it was still open at the time of the hearing on April 11, 1995.

vived by his widow, Lorene Chalk, and a daughter, Beverly Proctor.

The progress of the Estate of Axel Anderson (or the lack thereof) rivals that of the estate about which Charles Dickens wrote in *Bleak House.* Both estates went on unsettled from year-to-year and generation-to-generation. Of course, in *Bleak House* on the death of the person who had been determined to be the heir the estate was closed: the estate funds had been exhausted.

Dickens wrote *Bleak House* as a condemnation of lawyers and the legal system, and Dickens' efforts in this and other of his novels are often credited with precipitating reform of England's legal system.

That Axel Anderson's estate increased in value does not justify endless probate. The matter should have been concluded long before Sheriff Goenner's death in 1981. If early closure would have meant distribution of nothing more than fractional interests in real estate of modest worth, so be it. The option to sell or to hold the property as an investment belonged to the original heirs, several of whom have since died, not to the lawyer or personal representative.

I have no doubt that MacGibbon's conduct has been motivated by the best intentions, and it is apparent that the distributees have not complained about the delay. Nevertheless, the failure to settle Axel Anderson's estate within some reasonable time has constituted conduct violative of Rule 1.3, MRPC:

> A lawyer shall act with reasonable diligence and promptness in representing a client.

That conduct is also violative of Rule 3.2, MRPC:

> A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

Moreover, I regard this probate proceeding of more than 30 years' duration as harmful to the reputation of lawyers and the legal system and violative of Rule 8.4(d), MRPC:

> It is professional misconduct for a lawyer to:
>
>   \*    \*    \*    \*    \*    \*
>
> (d) engage in conduct that is prejudicial to the administration of justice.

For the foregoing reasons I consider a public reprimand warranted with respect to the handling of the Estate of Axel Anderson from and after January 1967.

KEITH, C.J., joins in the special concurrence of COYNE, J.