In the Matter of the Application for the DISCIPLINE OF Thomas C. DILLON, an Attorney at Law of the State of Minnesota.

No. C3–84–1250.

Supreme Court of Minnesota.

July 26, 1985.

Robert M. Greising, Waterville, for appellant.

Michael J. Hoover, Dir. of Lawyer Prof. Responsibility, William J. Wernz, Asst. Director, St. Paul, for respondent.

PER CURIAM.

The Director of the Lawyers Professional Responsibility Board (LPRB) filed a petition for disciplinary action against respondent, Thomas C. Dillon, charging him with several violations of the Minnesota Code of Professional Responsibility (MCPR). The referee appointed by this court found facts supporting all of the alleged violations and made recommendations for discipline.

Dillon has been licensed to practice law in Minnesota since 1963 and currently practices in Fairbault. A review of the referee's findings, which are basically uncontested, reveals that all of Dillon's alleged code violations arose out of the following occurrences. In December 1981, Dillon was retained by complainant to represent her family in a wrongful death action arising out of her husband's death in an automobile accident on December 18, 1981. Complainant, a physician since 1981, was the sister of Dillon's deceased first wife. Dillon and complainant entered into a fee agreement which provided that Dillon would receive 25% of any recovery either in the litigation or by settlement. Dillon expected and told complainant that the claim should be settled within a few months, since the other driver involved in the accident was clearly at fault and was insured for $500,000 plus excess coverage.

On March 1, 1982, Dillon wrote to complainant requesting that she loan him $40,-000 for required improvements to a hotel

he owned. Complainant made the loan, which was evidenced by a March 9, 1982, note and at Dillon's suggestion was secured by his contingent fee. On May 28, 1982, Dillon requested and received an additional $25,000 loan from complainant, also for use in the hotel. Dillon did not create or deliver a note or security for this second loan until 4 months later, when, upon the advice of her bank, complainant requested them. As was the first, this second note was secured by Dillon's contingent fee. Both notes were demand instruments at an interest rate of 13.226% per annum and, by oral agreement, were repayable when Dillon received his contingent fee. As additional security for the $65,000 total indebtedness, Dillon later gave respondent a third mortgage on his hotel which, despite Dillon's request to the contrary, was recorded on November 9, 1982.

Dillon, as complainant's former brother-in-law, was aware that complainant had received a substantial amount of money from her husband's life insurance policies and that she had no experience in managing or investing large sums of money. Nonetheless, in asking her to loan him the money, Dillon never explained to his client that he was not acting as her lawyer with regard to these loans. Moreover, he made no disclosure of the adverse nature of his and complainant's interests in making the loans or in their security.

Because the wrongful death claim had not been satisfactorily settled, Dillon commenced an action and on or about November 15, 1982, obtained an offer from the insurer of a $350,000 cash settlement. Complainant rejected the offer, however, and a week later discharged Dillon and retained another attorney. Dillon and complainant's new attorney agreed to divide equally any fees paid with regard to the wrongful death action. In May 1983, complainant agreed to a structured settlement pursuant to which the insurance company paid $103,000 for attorney fees and costs, representing approximately 25% of the present value of the structured settlement. On June 8, 1983, complainant's new attorney sent Dillon a check for $51,466, representing Dillon's share of the fee plus $25 in costs.

Shortly thereafter, Dillon wrote to complainant asking her to pay him an $87,500 fee, less the $51,466 he had received. This letter contained several misrepresentations, specifically:

I had a cash settlement offer of $350,000.00 when you fired me. The manner in which you retained [another attorney] made it impossible to protect my interest in the lawsuit. Under normal circumstances I would have been able to protect my fee up to $350,000 and share from ⅓ to 50% in any fee increase.

On the advice of her attorney, complainant refused to pay Dillon any additional amount, and Dillon did not pursue the matter.

Dillon subsequently paid complainant only $45,000 of the $51,466 he had received in fees, notwithstanding the security provisions of the notes, using the balance of $6,466 for his own purposes. Several times throughout the summer and fall of 1983, complainant demanded immediate payment of the balance due on the $65,000 loan. Dillon has, however, made no other payment and, at the time of the hearing, owed approximately $36,817.27 in principal and interest.

Dillon does not contest the referee's conclusion that he was guilty of misappropriating $6,466 in violation of DR 1-102(A)(4), DR 1-102(A)(6), DR 9-102(A)(2), and DR 9-102(b)(4), MCPR, when he paid complainant only $45,000 of the $51,466 he received, notwithstanding the notes securing complainant's interest in the entire $51,466. He similarly does not challenge the referee's characterization of the additional fee he attempted to collect from complainant as violating DR 2-106(A) because it was contrary to their fee agreement and because Dillon did not intend to have it approved by the district court as required by Minn.Stat. § 573.02 (1984). Finally, Dillon accepts the referee's finding that he misrepresented his right to the fee in the June 1983 letter in violation of DR 1-

102(A)(4). Dillon does, however, challenge the referee's conclusion that he committed two other code violations by (1) failing to disclose a conflict of interest in obtaining loans from his client and (2) impermissibly using his contingent fee to secure these loans.

### Conflict of Interest

■ It is settled that borrowing money from a client without disclosure of differing interests gives rise to an impermissible conflict of interest. *In re Pearson*, 352 N.W.2d 415 (Minn.1984). Complainant and Dillon clearly had differing interests of substantial consequence. By loaning Dillon $65,000, complainant's money was less secure than it had been while invested in government securities, and by agreeing to secure the loans with Dillon's contingent fee, complainant risked jeopardizing that security if she subsequently chose to change attorneys. Dillon also failed to warn complainant that he had judgment creditors when the loans were made. That Dillon has not repaid complainant indicates that he favored his own interests over those of his client. Dillon admits, however, that he never disclosed possible conflicts arising from these differing interests or advised complainant to obtain independent legal advice before making the loan.

Dillon argues that his conduct does not constitute a code violation because he was not acting as a lawyer for complainant when they discussed and transacted the loan. He points out that his letter characterized the loan as a "personal matter" and, moreover, that complainant relied upon other parties regarding her investments. In addition, Dillon challenges the referee's finding that he took advantage of complainant, stating that he put no undue pressure on complainant and, in fact, in his letter, told her not to make the $40,000 loan if she felt uncomfortable about it.

We reject Dillon's argument that he was not acting as a lawyer when he discussed and transacted the loan with his client. Complainant had no relationship with Dillon following her sister's death until she retained him as an attorney in 1981. Dillon was acting as complainant's attorney in transactions besides the insurance action and frequently met her for combination social and business lunches. In addition, Dillon had given her some financial advice, including how to invest the life insurance proceeds she had received, the funds from which the loans were later made. Although Dillon's letter indeed characterized the first loan as a "personal matter," the request was written on his office stationery. Finally, other factors should have alerted Dillon that complainant might be relying upon him as an attorney to exercise his professional judgment in her best interests. Complainant had no other attorney at that time. She had recently lost her husband and admitted that she was very inexperienced in dealing with money, a fact of which Dillon was aware.

■ These factors lead us to conclude that complainant would have expected Dillon to exercise his professional judgment to protect her interests. Absent a careful explanation to complainant before he discussed the investment that he was not acting as a lawyer, the Code of Professional Responsibility required Dillon to disclose fully the differing interests that existed. Dillon failed to give an explanation or disclosure and thereby engaged in professional misconduct in violation of DR 5–104(A), MCPR, warranting discipline.

### Use of a Contingent Fee as Security

At Dillon's suggestion, both loans he received from complainant were secured by the contingent fee he anticipated receiving as a result of his representation of her in the wrongful death action. The referee concluded that this transaction violated DR 5–103(A)(2), as interpreted by Ethical Consideration 5–7. Dillon contends, however, that if the contingent fee arrangement itself was permissible, use of the contingent fee as security does not change its permissibility under DR 5–103.

■ We reject Dillon's interpretation of DR 5–103(A)(2). That rule provides, in rel-

evant part, that the only proprietary interest in the action that a lawyer may acquire is a contract with the client for a reasonable contingent fee, a limitation intended to avoid "[t]he possibility of an adverse effect upon the exercise of free judgment by a lawyer on behalf of his client during litigation * * *." EC 5–7, MCPR. Using this contingent fee as security for a personal loan from a client is in effect acquiring a greater proprietary interest than permitted by DR 5–103, and such an interest clearly may have an adverse effect on the lawyer's exercise of free judgment on the client's behalf. It is therefore beyond the scope of what is permitted by DR 5–103. As an additional consideration, use of such security makes it difficult for a client subsequently to change attorneys without jeopardizing the security. Accordingly, we adopt the referee's conclusion that Dillon violated DR 5–103(A)(2), MCPR.

### Sanction

The recent disciplinary case of *In re Pearson*, 352 N.W.2d 415 (1984), bears significant similarity to the conduct in this case, particularly with respect to business transactions between Pearson and his client. Pearson was consulted by a client regarding a potential investment of $15,000 in apartment buildings. The client's sole source of income was $700 per month from social security for a disability. Pearson, for sound reasons, discouraged the proposed investment but suggested that the client invest in a meat packing business that Pearson was starting. The investment later took the form of a loan, evidenced by an unsecured 90-day note promising to repay the client $15,000 with interest of 2% per month. Although the client asked for security, Pearson declined to give it. Pearson represented to the client that the loan would be used for the purchase of meat for the business, but he instead used it for his personal use, including making a payment on his home mortgage. The referee found that Pearson knew or should have known that the corporation had been recently formed and that its ability to repay the loan was questionable and that

Pearson's own financial difficulties made questionable his ability to repay the client.

An additional charge, less similar to the instant case, arose out of the charging of an excessive fee in a marriage dissolution matter for a different client. Notwithstanding submission of the fee dispute to the Hennepin County Fee Arbitration Board, which ordered a refund of $4,472 of the $7,972 collected from the client, Pearson did not make the refund (but he did twice submit checks which were returned for insufficient funds). The referee recommended that Pearson be suspended for 2 years, but that the suspension be stayed subject to conditions.

Upon submission to this court, we added further findings based upon clear and convincing evidence in the record, namely (1) that the client represented by Pearson had received psychiatric treatment and at the time of the loan transaction was taking medication for mental and emotional problems of which Pearson was aware and (2) that Pearson failed to cooperate with the disciplinary investigation. We said, "Pearson entered into a loan transaction with a client, taking advantage of a vulnerable, trusting person. Pearson's concern was for his own financial interests, not for the financial interests and needs of his client." 352 N.W.2d at 419. We added, "[Pearson] did not cooperate with the disciplinary investigation. He disregarded the interests of a trusting client and borrowed money from his client which he made no effort to repay. Finally, what is most disturbing is the complete absence of a willingness to admit that he has harmed his clients and failed to comply with the professional standards set forth by the Code of Professional Responsibility." 352 N.W.2d at 420. We accordingly indefinitely suspended Pearson from the practice of law with the right to apply to this court for readmission after a period of 2 years subject to the further conditions (1) that he repay the loan with interest and satisfy the arbitration award and (2) that he successfully complete the Multistate Professional Responsibility Examination.

The elements of similarity in the central complaint seemingly influenced the referee's similar recommendation of a 2-year suspension with restitution. Serious as is the misconduct in the present case, we conclude that it is not as egregious as that in *Pearson* and accordingly does not require as severe a sanction. The vulnerability of the respective clients is notably different. Although neither was experienced in financial affairs, there is a marked difference between a highly intelligent woman who is a physician and a social security recipient who is under treatment for mental and emotional problems. There is a difference in the degree of risk to which the clients were exposed: Pearson induced a loan for the use of a new and untested enterprise and then, worse, did not use the money for the represented purpose. Dillon did use the money for the stated purposes and did give some security, however reluctant and questionable in view of the financial problems of the hotel enterprise. Dillon has not yet repaid complainant, but he has put his home, appraised at $94,000, up for sale and has offered complainant a mortgage on it, repayable upon sale. Complainant has requested that the court not deal harshly with Dillon, stating that she commenced this proceeding only to recover her money and that she considers Dillon a very decent person who has "never done anything dishonest or intentionally deceived [her]." Except for the two issues specifically considered, Dillon does recognize and admit that his conduct was wrong, and he has cooperated fully with the director's investigation of this case.

Although we conclude that the sanction against Dillon should not be as severe as that in *Pearson*, neither should the sanction be minimal, for, as the referee concluded, throughout these transactions "[Dillon] has placed his own personal economic interests ahead of those of complainant in areas where the interests conflict." His estimated net worth at the time of the transactions was $489,400, including his hotel, but as the referee concluded, he made no serious attempt to sell the hotel or otherwise to repay complainant during the time his loan obligations have been delinquent. He could have refinanced his home to obtain $30,000, as he did in April 1983. Complainant has been forced to retain counsel for the purpose of collecting the more than $36,000 outstanding balance on the subject notes. Not only did Dillon borrow money from complainant without disclosing conflicting interest and secure the loan with his contingent fee, he attempted to charge an illegal and excessive fee, misrepresenting his entitlement to it, the more serious because he had received a prior warning in 1978 with respect to the charging of excessive fees.

We think a minimum suspension of 1 year is appropriate. Accordingly, respondent, Thomas C. Dillon, is hereby indefinitely suspended from the practice of law with the right to apply to this court after a period of 1 year from the date of this opinion subject to the following conditions:

(1) restitution to complainant, including any costs and attorney fees that she has incurred or will incur in connection with the collection of Dillon's indebtedness to her, with proof of payment satisfactory to the LPRB within the 1-year period, and

(2) successful completion of the Multistate Professional Responsibility Examination.