STATE OF MINNESOTA

IN SUPREME COURT

A13-1382

Original Jurisdiction

Per Curiam
Dissenting, Anderson, J. and Gildea, C.J.

In re Petition for Disciplinary Action
against Larry S. Severson, a Minnesota
Attorney, Registration No. 99363

Filed: February 18, 2015
Office of Appellate Courts

_____

Martin A. Cole, Director, Joshua H. Brand, Assistant Director, Office of Lawyers Professional Responsibility, Saint Paul, Minnesota, for petitioner.

Eric T. Cooperstein, Law Office of Eric T. Cooperstein, PLLC, Minneapolis, Minnesota, for respondent.

_____

S Y L L A B U S

The respondent attorney engaged in misconduct by entering into an investment agreement, which amounted to an unsecured $500,000 loan, and several related business transactions with a client in violation of his obligations under the rules of professional conduct regarding conflicts of interest. The attorney also made misrepresentations to a client and opposing counsel in the course of a civil lawsuit, and to the Director during the disciplinary investigation, caused harm to his client, and did not demonstrate genuine remorse for the misconduct. Based upon these violations of the rules of professional conduct, the appropriate discipline is an indefinite suspension from the practice of law with no right to petition for reinstatement for 1 year.

1

OPINION

PER CURIAM.

In July 2013 the Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action alleging that respondent Larry S. Severson violated the rules of professional conduct by entering into an investment agreement with a client, D.S., and having D.S. sign an assignment and mortgage without disclosing his personal interest. The Director also alleged that Severson made several misrepresentations to D.S., to opposing counsel in connection with a civil lawsuit to be brought by D.S., and to the Director. Following a hearing, the referee made findings of fact and conclusions of law that Severson engaged in the majority of the misconduct alleged in the petition and that Severson's lack of remorse was not an aggravating factor. The referee recommended that Severson be suspended from the practice of law for 90 days. Because we conclude the referee clearly erred in finding that Severson's lack of remorse was not an aggravating factor, and that the referee's recommended discipline does not sufficiently account for the seriousness of Severson's misconduct, we indefinitely suspend Severson from the practice of law with no right to petition for reinstatement for 1 year.

Severson was admitted to practice law in Minnesota in 1975, and was a shareholder in the law firm of Severson, Sheldon, Dougherty and Molenda, P.A. (law firm) until 2012. Severson recently started a new law firm with two other attorneys. Severson was also engaged in extensive business dealings in car dealerships, banks, and commercial real estate redevelopment projects.

The misconduct in this case relates to D.S., who was a member of Severson's household. D.S.'s childhood history was tragic. When D.S. was 3 months old, her parents were killed in a car accident. D.S. was the sole beneficiary of various insurance proceeds that were placed in a conservatorship administered by her adoptive mother (mother). When D.S. was in high school, she experienced serious conflicts with her stepfather that they could not resolve. As a result, D.S. asked and Severson agreed that she would become a member of the Severson household. The Seversons thereafter treated D.S. like a daughter.

*Investment Agreement*

When D.S. turned 18 in April 1996, she was informed by her mother that the conservatorship should be closed, and the funds transferred to D.S. D.S. discussed the matter with Severson, and Severson told her that his law firm could assist her. D.S. also discussed with Severson how to invest the funds she would be receiving from the conservatorship. She told Severson she wanted to go to college and use the inheritance to pay for college. Severson offered to invest D.S.'s inheritance and pay her 9% interest annually to cover her living expenses and tuition.

Severson's law firm prepared the documents necessary to close the conservatorship. A paralegal and an associate at the firm performed most of this work, although Severson was listed as an attorney on court filings. The conservatorship was closed on May 31, 1996, and on June 5, 1996, $541,868 was deposited in the law firm's trust account for D.S.

3

Severson prepared an investment agreement that was signed by D.S. and Severson on June 4, 1996. The investment agreement provided that Severson would invest the principal of approximately $500,000[1] for 48 months "in mortgages, securities, and other interest generating investments," pay D.S. a fixed return of 9% annually, and then return the principal to D.S. at the end of 48 months. Severson also prepared a power of attorney, which D.S. signed, appointing himself as the attorney in fact for D.S. with respect to funds held in several bank accounts.

D.S. initially attended college at Mount Holyoke College in Massachusetts, and then transferred to Saint Catherine University in Saint Paul to be closer to her ailing mother, who died in 2000. As a result of the transfer and the emotional toll of her mother's death, D.S. did not graduate from college in 2000. As contemplated by the agreement, D.S. and Severson orally agreed to extend the investment agreement, but at a reduced interest rate of 8%.

Severson testified that he did not recall where he invested D.S.'s money between 1996 and 2002. In 2002, Severson used all of D.S.'s money and $250,000 of his own funds to purchase 482 shares of a bank holding company, Financial Services of Saint Croix Falls, Inc. (FSSCF).

The law firm did other legal work for D.S. Severson arranged for another attorney at his firm to prepare estate planning documents for D.S, which were executed in 2000.

---

[1] The same day $541,868 was deposited in the trust account, $41,856 was withdrawn and allegedly paid to D.S., although neither D.S. nor Severson has any specific recollection regarding this withdrawal. In any case, the parties do not dispute that about $500,000 remained in the trust account for D.S.

Between 2004 and 2007, Severson represented D.S. in a dispute she had with a former landlord over a security deposit. In 2006, Severson drafted a contract for a business D.S. started and filed the necessary documents to form a limited liability corporation.

*Severson's Financial Difficulties*

In January 2007, D.S. requested that Severson return the $500,000 to her. Because Severson was unable to consummate a sale of the FSSCF stock, Severson was unable to return D.S.'s principal. By 2008, Severson was in serious financial trouble. Notably, Severson had acquired an equine center in 2007 and later sold the facility for $1.5 million on a contract for deed, but the purchasers defaulted on the contract. Thereafter, Severson assigned his seller's interest in the equine center to D.S. as security for her principal, and had D.S. sign a $250,000 mortgage regarding their interest in the equine center; but Severson did not explain to D.S. that he had her sign the documents because of his financial difficulties.

Additionally, Prosperan Bank, the mortgage holder on one of Severson's real estate projects, threatened to foreclose on the mortgage when Severson's partner in the project declared bankruptcy. To avoid foreclosure, Severson had D.S. assign her seller's interest in the equine center to Prosperan, telling her that it would help him repay her principal. The assignment represented, among other things, that D.S. was Severson's daughter and that she would benefit from the forbearance of the mortgage foreclosure.

5

Subsequently, D.S. received a delinquent tax notice in 2009 on the equine center, and in 2010 the mortgage holder brought a foreclosure action naming D.S. as a co-defendant.[2]

*Misrepresentations*

D.S. hired an attorney who sent a demand letter in October 2009 to Severson seeking return of the $500,000 and an accounting. Severson responded that he owed D.S. about $410,000, subject to a final accounting. Severson's accountant determined the amount owing was $371,363 after subtracting four legal invoices purportedly from the law firm to D.S. for services rendered. The Director discovered, however, that the four legal invoices were not prepared by the law firm; instead the invoices were prepared by Severson for the final accounting. In July 2010, D.S. sued Severson seeking return of her principal. The case was settled in December 2010 for $435,000, from which $135,000 was paid by D.S. for attorney fees. Thus, D.S. recovered only $300,000 of the $500,000 she had originally given to Severson.

Severson's misconduct was reported to the Director. During the disciplinary investigation Severson stated, through counsel,[3] in response to a question from the Director, that D.S.'s funds were, at all times, invested in FSSCF stock. The Director pressed Severson for documentary proof because Severson's statements were inconsistent with Severson's filings with the Secretary of State. Severson retracted his statement, and

---

[2] In September 2009, Severson lowered the interest rate in the investment agreement from 8% to 7% because of his financial difficulties. Severson informed D.S., and she acquiesced to the change.

[3] Severson retained new counsel to represent him before our court.

6

stated he did not know where D.S.'s funds were invested from 1996 until 2002. Severson forwarded the four legal invoices to the Director but failed to disclose that the invoices were prepared for the final accounting.

The Director filed a petition for disciplinary action alleging multiple acts of misconduct: (1) Severson entered into an investment agreement with D.S. in 1996, in violation of Minn. R. Prof. Conduct 1.7(b) (1996) and 1.8(a) (1996); (2) Severson misrepresented that checks issued from D.S.'s funds in 1996 were used for real estate purchases, in violation of Minn. R. Prof. Conduct 8.4(c);[4] (3) Severson assigned his seller's interest in the equine center to D.S. and then had D.S. assign and mortgage her interest in the equine center to two of Severson's creditors, in violation of Minn. R. Prof. Conduct 1.7(a)(2), 1.7(b), and 1.8(a); (4) Severson acted dishonestly by having D.S. assign and mortgage her interest in the equine center to his creditors without disclosing that his financial insecurity necessitated the assignments, in violation of Minn. R. Prof. Conduct 8.4(c); (5) Severson misrepresented to Prosperan that Severson was his daughter, in violation of Minn. R. Prof. Conduct 8.4(c); (6) Severson made misrepresentations to opposing counsel and to the Director when he submitted misleading invoices ostensibly from his law firm to reduce the amount of money it appeared he owed D.S., in violation of Minn. R. Prof. Conduct 8.1(a) and (b), and Minn. R. Prof. Conduct 8.4(c); and (7) Severson made misrepresentations to the Director that at all times D.S.'s

---

[4]     Unless otherwise indicated, citations to the Minnesota Rules of Professional Conduct are to the rules currently in effect.

7

funds were invested in FSSCF stock, in violation of Minn. R. Prof. Conduct 8.1(a) and (b).

The referee concluded that Severson engaged in acts of misconduct (1), (3), (4), (5), (6), and (7) described above in violation of the applicable rules of professional conduct but found no violation with respect to act of misconduct (2). The referee also found that remorse was neither an aggravating nor a mitigating factor. Further, the referee found that Severson's repayment of D.S. was both an aggravating and mitigating factor; and that Severson's charitable contributions, pro bono work, and community service mitigated his misconduct. The referee recommended a 90-day suspension without the requirement that Severson petition for reinstatement.

I.

The Director bears the burden of proving professional misconduct by clear and convincing evidence. *In re Voss,* 830 N.W.2d 867, 874 (Minn. 2013). When either party timely orders a transcript of the referee's hearing, as the Director did here, the referee's findings and conclusions are not conclusive. Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR); *Voss*, 830 N.W.2d at 874. But we give "great deference" to the referee's findings and will uphold those findings if they have evidentiary support in the record and are not clearly erroneous. *Voss*, 830 N.W.2d at 874. A referee's findings are clearly erroneous only when they leave this court "with the definite and firm conviction that a mistake has been made." *In re Coleman*, 793 N.W.2d 296, 303 (Minn. 2011) (citations omitted) (internal quotation marks omitted).

8

Severson argues that the referee erred in concluding that he violated the conflict of interest rules when he entered into the investment agreement with D.S.[5] Also, the parties dispute the referee's findings related to the misrepresentations involved in acts of misconduct (2), (4), (5), and (7). Further, the Director disputes the findings that remorse was not an aggravating factor, and that Severson was not motivated by selfishness. We will discuss each issue in turn.

## A.

Severson first argues that the referee erred in finding that he violated the conflict of interest rules when he entered into the investment agreement with D.S.[6] According to Severson, no attorney-client relationship existed at the time the investment agreement was executed, and therefore the conflict of interest rules did not apply to him. To answer the question presented, we must determine whether an attorney-client relationship existed during the relevant time period, and if it did, whether the conflict of interest rules were violated.

To establish a violation of the conflict of interest rules, the Director must first prove the existence of an attorney-client relationship at the time of the alleged wrongful conduct. *See In re Perry*, 494 N.W.2d 290, 294 (Minn. 1992) (concluding that if there was no attorney-client relationship, there could be no violation of Rules 1.4 and 1.7). An attorney-client relationship may arise under either a contract or a tort theory. *Id.* Neither

---

[5] Severson does not dispute that he violated the conflict of interest rules in act of misconduct (3) and does not dispute the misrepresentation in act of misconduct (6).

[6] This contention relates to act of misconduct (1).

party challenges the referee's finding that "[a]t the time of the [1996] Agreement, there was no express or implied agreement to enter into an attorney-client relationship." Therefore, the appropriate analytical framework for determining whether an attorney-client relationship existed is under the tort theory.

An attorney-client relationship is created under the tort theory "whenever an individual seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice." *Perry*, 494 N.W.2d at 295 (citation omitted) (internal quotation marks omitted). Generally, whether an attorney's advice could be relied upon to establish an attorney-client relationship is a question of fact. *Admiral Merchs. Motor Freight, Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 266 (Minn. 1992). We look to the surrounding communications and circumstances to determine whether reliance on an attorney's advice was reasonable. *Id.* at 265. It is incumbent on the lawyer to clarify any ambiguity. Geoffrey C. Hazard, Jr. et al., *The Law of Lawyering* § 2.5 (3d ed. Supp. 2013) (referring to Section 14 of the Restatement of the Law Governing Lawyers). The need to clarify any ambiguity is especially important when lawyers step outside the practice of law and provide non-legal services, such as business and investment services.

There is ample evidence in the record to support the referee's conclusion that D.S. sought legal services from Severson. D.S. approached Severson to help her close the conservatorship and invest her money, and Severson indicated that his law firm could

10

assist her.[7]  Further, D.S. testified that she asked Severson for help in investing her money because he was an attorney.  Severson's statement that his law firm could help D.S. provides additional evidence that the services D.S. was seeking were legal in nature.

The record further shows that D.S. received legal advice from Severson.  Along with the investment agreement, Severson prepared and then had D.S. sign a power of attorney that made him attorney in fact for D.S. with respect to several bank accounts.  While a power of attorney does not need to be drafted by a lawyer, it is a legal document that lawyers typically draft for clients.  *Cf. Perry*, 494 N.W.2d at 295 (concluding that preparing trust and trust amendment documents and letter to opposing counsel "are commonplace in the legal community").

Finally, the record establishes that a reasonable person in D.S.'s shoes would have relied on the legal advice Severson provided to D.S.  D.S. asked Severson for help, and Severson told D.S. that his law firm could help her.  Thus, it was Severson's own words

---

[7]  The referee based his finding of an attorney-client relationship on the fact that Severson's law firm performed legal work in order to close the conservatorship and D.S. was sent a bill for this work.  Severson argues that D.S.'s mother, the conservator, was actually the firm's client.  He notes that D.S.'s mother met with the paralegal four times in order to prepare documents for closing the conservatorship and that his law firm ordinarily considered the conservator, not the conservatee, the client when a conservatorship was closed.

Because there is sufficient evidence in the record that Severson performed legal work for D.S. with respect to investing her funds, including drafting the power of attorney, it is not necessary to examine the legal work performed for the closing of the conservatorship to determine whether an attorney-client relationship existed when the investment agreement was signed.  Also, it is not necessary to decide whether Severson's firm represented D.S. with respect to the closing of the conservatorship, and we express no opinion on that topic.

11

that indicated he was going to perform legal work for D.S. The power of attorney form, which was signed in order to assist Severson in investing D.S.'s money, has a stamp on the bottom of it indicating it was drafted by Severson's law firm. Severson never told D.S. that he was not acting as her lawyer when he drafted this legal document. In addition, the funds from the conservatorship that Severson was going to invest for D.S. were transferred into Severson's law firm's client trust account. Based on all of these facts, the referee did not clearly err when he concluded that it was reasonable for D.S. to have relied on Severson's legal advice.

In summary, the referee's findings that D.S. sought legal advice from Severson to help her close the conservatorship and invest her money; that she received legal advice from Severson, including the execution of the power of attorney; and that it was reasonable for D.S. to have relied on this legal advice are supported by the record. Consequently, the referee did not clearly err when he found that an attorney-client relationship existed between D.S. and Severson when they executed the investment agreement.

B.

We next examine whether the referee's finding that Severson violated the conflict of interest rules is supported by the record. Rule 1.7, as it existed in 1996, provided that an attorney was prohibited from representing a client if the representation would be "materially limited . . . by the lawyer's own interests." Minn. R. Prof. Conduct 1.7(b) (1996). The prohibition did not apply if: "(1) the lawyer reasonably believ[ed] the representation [would] not be adversely affected; and (2) the client consent[ed] after

12

consultation." *Id.* An attorney was also prohibited from entering into a business transaction with a client unless: (1) the terms of the transaction were fair and reasonable and were communicated to the client in writing in a manner understandable to the client; (2) the client was given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) the client consented in writing. Minn. R. Prof. Conduct 1.8(a) (1996).

Severson violated Rules 1.7(b) and 1.8(a) when he entered into the investment agreement with D.S.[8] Severson had a concurrent conflict of interest because his representation of D.S. in the drafting and execution of the power of attorney was materially limited by Severson's own personal interests in the investment agreement. *See* Minn. R. Prof. Conduct 1.7(b) (1996). D.S. did not consent to the conflict of interest. Moreover, the agreement did not provide security for D.S.'s investment, limit the types of investments Severson could make, or provide for a penalty, or the recovery of her funds, if Severson did not comply with the agreement. As a result, the referee correctly found that the absence of these protections in the investment agreement made the agreement unfair and unreasonable. *In re Peterson*, 456 N.W.2d 89, 90 (Minn. 1990) (concluding that the record supported the referee's finding that an unsecured loan from a client was not fair and reasonable). Additionally, Severson did not adequately explain the

---

[8] The only challenge Severson makes to the referee's findings and conclusions that he violated Rule 1.7 and 1.8 with respect to the investment agreement is his claim that he did not have an attorney-client relationship with D.S. in 1996. In fact, Severson admits in his brief to our court that if an attorney-client relationship existed, "then [he] is responsible for not having complied with the Rule 1.8(a)."

13

investment agreement to D.S. and did not provide her with a reasonable opportunity to seek advice from independent counsel. *See* Minn. R. Prof. Conduct Rule 1.8(a) (1996). We therefore hold that the referee's conclusion that Severson entered into the investment agreement with D.S. in violation of Minn. R. Prof. Conduct 1.7(b) (1996) and 1.8(a) (1996) was not clearly erroneous.

## C.

The parties dispute the referee's findings regarding misrepresentations in four areas. First, the Director argues the referee erred by finding Severson's withdrawal of D.S.'s funds in 1996 from the law firm's trust account and payment of those funds to Valley Ford, Inc. did not involve dishonesty, fraud, deceit, or misrepresentation.[9] According to the Director, Severson misrepresented that the funds would be invested in real estate purchases.

Lawyers are prohibited from engaging in conduct that involves "dishonesty, fraud, deceit, or misrepresentation." Minn. R. Prof. Conduct 8.4(c). The referee found that in 1996 the law firm issued a check from the trust account holding D.S.'s funds for $434,000 payable to Valley Ford, Inc. with the notation on the check "Real Estate purchase." It is undisputed that the law firm issued a trust account check in 1996 for $434,000 to Valley Ford, Inc. with the notation "Real Estate purchases." The Director, however, failed to prove where the funds were invested between 1996 and 2002. Severson stated in a letter that he did not save the accounting records for the time period

---

[9]    This contention relates to act of misconduct (2).

14

prior to 2002. Also, Severson's bank records do not indicate where D.S.'s funds were invested from 1996 to 2002. Severson testified that he did not remember where he invested D.S.'s funds prior to 2002, at which point he invested them in FSSCF. Without evidence that the funds were not invested in real estate purchases in 1996, there is no evidence to support the Director's position that Severson misrepresented what he had done with the funds in 1996. Consequently, the referee's conclusion that the Director failed to prove that Severson misrepresented in 1996 that the funds were invested in "Real Estate purchases" was not clearly erroneous.

Second, Severson argues the referee erred by finding he made misrepresentations to D.S. regarding the equine center property assignment and mortgage in 2008 and 2009.[10] The referee found that Severson did not adequately explain the equine center transactions to D.S, and that he "was motivated in part by his desire to mislead [D.S.] . . . as to the degree of financial risk she was experiencing while [Severson] had her money."

Severson admitted that at the time he had D.S. assign and mortgage her interest in the equine center, he was having serious financial difficulties. Severson had D.S. assign and mortgage her interest in the equine center to provide security for a personal loan Severson had outstanding with a creditor. Severson did not explain to D.S. that the purpose of having her mortgage her interest in the equine center was to provide security for one of his creditors. Severson admitted that he failed to explain to D.S that he was having financial difficulties, and that given his financial difficulties, her funds may be at

---

[10] This contention relates to act of misconduct (4).

15

risk.  Consequently, the testimony supports the referee's finding that Severson intentionally misled D.S. at the time of the assignment.

Third, Severson challenges the referee's finding that he misrepresented to Prosperan that D.S. was his daughter during negotiations of an assignment and forbearance agreement.[11]  The referee found that the document that assigned D.S.'s interest in the equine center to Prosperan stated that D.S. was Severson's daughter. Additionally, the referee found that Severson's testimony that he did not notice the language stating D.S. was his daughter was not credible given the placement of the language in a separate paragraph of the assignment and "its probable importance to Prosperan."

We conclude that the referee's finding that Severson intentionally misled Prosperan during the negotiation of the forbearance agreement was clearly erroneous. There is no evidence that Severson misrepresented to Prosperan that D.S. was his daughter.  Severson did not sign the assignment, and testified he did not notice the statement in question.  Consequently, the referee's finding is not supported by the record.

Fourth, Severson argues his statements to the Director indicating that D.S.'s funds were used to purchase FSSCF stock in 1996 were not misrepresentations.[12]  The referee found that the Director made repeated efforts to clarify the issue in written communication with Severson and that Severson intentionally misled the Director by

---

[11]     This contention relates to act of misconduct (5).

[12]     This contention relates to act of misconduct (7).

16

stating D.S.'s money was invested in FSSCF prior to 2002. The finding is supported by the record. The Director stated in a letter his understanding that D.S.'s money was invested in FSSCF in the summer of 1996, and explicitly invited Severson to correct any inaccuracies. Severson responded that D.S.'s "money at all times was invested in [FSSCF]." Consequently, the referee's finding that Severson made intentional misrepresentations in letters to the Director about when D.S.'s money was invested in FSSCF was not clearly erroneous.

D.

The Director argues that lack of remorse was an aggravating factor. According to the Director, Severson did not express remorse for any of the proven misconduct and the remorse he did express related only to the impact his misconduct had on himself and his family.

The referee found that remorse was neither a mitigating nor an aggravating factor. Specifically, the referee found that Severson was remorseful about losing his relationship with D.S., that Severson understood that the loss of that relationship was harmful to D.S., and acknowledged his responsibility for extremely poor bookkeeping and his inability to repay D.S upon her request. But the referee also found that Severson had not "internalized or expressed remorse" for his misconduct of failing to advise D.S. when entering into the investment agreement, for his inappropriate investments of D.S.'s money, for "his extremely troubling attitude in 2008 and 2009" that he did not need to adequately explain the additional business transactions D.S. entered into related to the

17

equine center, and for the many steps he took in D.S.'s name "to survive the financial risks he faced."

An attorney's remorse can be a mitigating factor in considering the appropriate discipline. *In re Rooney*, 709 N.W.2d 263, 271 (Minn. 2006). Conversely, an attorney's lack of remorse can aggravate an attorney's misconduct. *Id.* at 271 n.4. To express remorse, an attorney must express genuine regret and moral anguish for his or her conduct and the effect it had on others. *See In re Fairbairn*, 802 N.W.2d 734, 746 (Minn. 2011) (concluding that attorney showed remorse when she testified that "her actions were 'just not right' and 'horrible' "); *In re Aitken*, 787 N.W.2d 152, 163 (Minn. 2010) (concluding that attorney did not show remorse when he "expressed remorse for the consequences of his misconduct, but not remorse for his actual misconduct"); *In re Panel File 98-26*, 597 N.W.2d 563, 569 (Minn. 1999) (concluding the attorney expressed remorse when she "repeatedly expressed remorse over her actions" and apologized to those affected by her conduct); *In re Otis*, 582 N.W.2d 561, 565 (Minn. 1998) (concluding it would be unjust to impose reciprocal discipline on an attorney for misconduct he committed in another state, in part, because he "has expressed remorse for the pain he caused his clients"); *In re McCoy*, 447 N.W.2d 887, 891 (Minn. 1989) (concluding there were no mitigating factors present when "respondent has never accepted responsibility or expressed remorse for the harms his clients suffered due to his inexcusable misconduct").

The referee found, and the record supports the finding that Severson did not express genuine regret and moral anguish for his misconduct and the effect it had on D.S.

18

Instead, Severson merely expressed regret over the effect the misconduct had on himself. But remorse requires genuine regret and moral anguish for the effect that the misconduct had on the victim, not on the attorney. Here, Severson's regret directed at himself is not remorse within the meaning of our case law. Also, acknowledging extremely poor record keeping when Severson's misconduct does not relate to bad record keeping has little to do with remorse.

It is true the referee found that Severson expressed remorse for the effect that the loss of the relationship with Severson had on D.S., and his inability to pay D.S. We have carefully reviewed the transcript of Severson's testimony and find no evidentiary support for those findings. We therefore reject them as clearly erroneous. *See In re Coleman*, 793 N.W.2d 296, 303 (Minn. 2011) (stating that we will uphold a referee's factual finding if it has evidentiary support in the record).

Severson did not express remorse for how his misconduct affected D.S. or others. Throughout the disciplinary process Severson continued to deny that he committed much of the misconduct, contending that D.S. was not his client in 1996 and that he did not notice the misstatements his attorney made to the Director. *See In re Nathan*, 671 N.W.2d 578, 585 (Minn. 2003) (concluding that attorney failed to express remorse when he "d[id] not acknowledge his actions were wrong"). Accordingly, we hold that the referee's finding that remorse was not an aggravating factor was clearly erroneous.

E.

Finally, the Director argues that the referee erred in failing to find that Severson's conduct was motivated by selfishness. The Director contends that Severson put his own financial well-being, as well as that of his other creditors, ahead of D.S.'s.

An attorney's selfish motive may be an aggravating factor. *See, e.g.*, *In re Fairbairn*, 802 N.W.2d 734, 747 (Minn. 2011). In *Fairbairn*, we considered whether the referee erred by not finding that the attorney had selfish motives when misappropriating client funds. *Id.* We concluded the referee did not clearly err by finding the attorney did not have a selfish motive because the attorney took the money with the intention of temporarily borrowing the money and not permanently defrauding clients. *Id*.

We conclude that the referee's finding that Severson's motivations were not selfish was not clearly erroneous. Severson testified that he intended to subsidize D.S.'s education through the investment agreement because he knew he could not obtain a 9% return on the investment. Severson also testified that the original purpose for assigning the equine center to D.S. was to provide a source of payment for her inheritance. This testimony supports the referee's finding that Severson's motivations were not selfish.

In sum, we uphold all but two of the referee's findings. We conclude the referee clearly erred when he found that Severson misrepresented to his bank that D.S. was his daughter, and clearly erred when he did not find that Severson's lack of remorse was an aggravating factor. We now turn to the appropriate discipline.

20

## II.

The referee recommended that Severson be suspended from the practice of law for 90 days and that he be required to successfully complete the professional responsibility portion of the state bar examination. The Director contends that Severson's violation of the conflict of interest rules and his misrepresentations warrant an indefinite suspension for a minimum of 3 years. Severson asks us to adopt the referee's recommendation.

The purpose of disciplinary sanctions for professional misconduct is not to punish the attorney, but rather to protect the public, safeguard the judicial system, and deter future misconduct by the disciplined attorney and other attorneys. *In re Rebeau*, 787 N.W.2d 168, 173 (Minn. 2010). In imposing the appropriate discipline, four factors guide us: (1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violation; (3) the harm to the public; and (4) the harm to the legal profession. *Id.* We administer sanctions on a case-by-case basis after considering any aggravating and mitigating circumstances, but we also look to similar cases to ensure consistent discipline. *Id.* at 173-74.

## A.

Severson's misconduct is very serious. Severson entered into multiple business transactions with a client in violation of the conflict of interest rules. The investment agreement he entered into with D.S. was essentially an unsecured loan of $500,000 from D.S. to Severson. Severson did not adequately explain the transaction to D.S. or advise her to seek independent counsel, and the terms of the agreement were not fair or

21

reasonable.[13]  Moreover, Severson continued to violate the conflict of interest rules by having D.S. assign and mortgage her interest in the equine center without adequately explaining these transactions or their purposes to D.S. and without advising her to seek independent counsel.  Violations of conflict of interest rules merit serious disciplinary sanctions.  *See in re Swensen*, 743 N.W.2d 243, 247-48 (Minn. 2007) (violations of Rule 1.8(a)).  We have suspended attorneys in cases involving conflicts of interest along with other misconduct.  *In re Varriano*, 755 N.W.2d 282, 291-92 (Minn. 2008).

Additionally, Severson engaged in multiple acts of dishonesty by: (1) intentionally misleading D.S. as to the purpose of the real estate assignments in 2008 and 2009, thereby hiding a significant risk of loss to her funds because of his financial

---

[13]  Like us, the dissent affirms the referee's findings that Severson and D.S. had an attorney-client relationship in 1996 and that Severson violated the conflict of interest rules when he entered into the investment agreement with D.S. in 1996.  When it discusses the appropriate discipline, however, the dissent does not consider Severson's violation of the conflict of interest rules in 1996.  It also does not consider the harm D.S. suffered from entering into the investment agreement with Severson because she had to sue Severson in order to get her principal back, and in the end, did not receive $200,000 of her money.

Instead, the dissent contends that "the imposition of discipline is more appropriately focused on" the misrepresentations Severson made to various people.  It focuses on the misrepresentations because "the existence of an attorney-client relationship in 1996 is tenuous at best."  The dissent's focus on some of Severson's misconduct is contrary to our case law, which requires us to look at all of an attorney's misconduct when determining the proper discipline to impose.  *See, e.g.*, *In re Panel Case No. 35104*, 851 N.W.2d 620, 625 (Minn. 2014) (holding that a panel of the Lawyer's Professional Responsibility Board acted arbitrarily and capriciously because it did not consider the lawyer's "misconduct as a whole" when it determined what discipline was appropriate); *In re Geiger*, 621 N.W.2d 16, 23 (Minn. 2001) ("Even where no single act of misconduct standing alone warrants severe public discipline, the cumulative weight and severity of multiple disciplinary rule violations may compel such discipline.").

difficulties, in violation of Rule 8.4(c); (2) intentionally misleading D.S. that the four legal invoices were legitimate invoices of the law firm representing money owed by D.S. that should be deducted from the money Severson owed D.S., in violation of Rule 8.4(c) and (d); (3) intentionally misleading the Director that the invoices were legitimate invoices from the law firm, in violation of Rules 8.1 and 8.4(c); and (4) intentionally misleading the Director that D.S's money was at all times invested in FSSCF, in violation of Rules 8.1 and 8.4(c). Making false statements is "misconduct of the highest order and warrants severe discipline." *In re Ruffenach*, 486 N.W.2d 387, 391 (Minn. 1992); *see also In re Lyons*, 780 N.W.2d 629, 636 (Minn. 2010) (characterizing making false and misleading statements to the Director as "serious").

B.

"[T]he cumulative weight and severity of multiple disciplinary rule violations may compel severe discipline even when a single act standing alone would not have warranted such discipline." *In re Oberhauser*, 679 N.W.2d 153, 160 (Minn. 2004). When considering the cumulative weight of the misconduct, we distinguish between "a brief lapse in judgment or a single, isolated incident" from "multiple instances of mis[conduct] occurring over a substantial amount of time." *In re Fairbairn*, 802 N.W.2d 734, 743 (Minn. 2011) (citation omitted) (internal quotation marks omitted) (concluding that six separate instances of misappropriation over the course of 13 months constituted more than "a brief lapse in judgment").

The cumulative weight of the disciplinary violations begins with Severson's misconduct in 1996 when he entered into the investment agreement with D.S, and then

23

continues again in November 2008 when Severson had D.S. assign her vendor's interest in the equine center to his creditor. The misconduct continued for 2 years with Severson making additional misrepresentations to D.S., the Director, and third parties. Severson's multiple acts of misconduct over a period of years suggest more than a brief lapse in judgment. *In re Hummel*, 839 N.W.2d 78, 82 (Minn. 2013) (concluding that an attorney's misconduct was not caused by a brief lapse in judgment because the misconduct occurred over several months).

## C.

Severson's misconduct harmed D.S., who trusted him. It took D.S. several years to recover some of her principal from Severson, she had to hire an attorney in order to do so, and in the end, she lost at least one-third of the principal she had given to Severson. *See In re Coleman*, 793 N.W.2d 296, 308 (Minn. 2011) (stating that harm to public and legal profession requires consideration of the number of clients harmed and the extent of the client's injuries). Severson's misconduct in this case reflects poorly on the profession as a whole and undermines the public's trust in lawyers. *In re Varriano*, 755 N.W.2d 282, 292 (Minn. 2008) (observing that the failure to explain a conflict of interest to a client "is the sort of behavior that decreases public trust in the profession"); *In re Ruffenach*, 486 N.W.2d 387, 391 (Minn. 1992) ("Honesty and integrity are chief among the virtues the public has a right to expect of lawyers.").

## D.

The referee found that Severson's extensive community service, charitable contributions, and pro bono work constitute a mitigating factor. But Severson's lack of

24

remorse is troubling. Severson presented no evidence that he has any remorse, or even insight, into the harm he caused D.S. or the profession by his multiple violations of the conflict of interest rules and multiple acts of dishonesty. Separately, it is troubling that D.S. was required to commence a lawsuit and incur $135,000 in attorney fees to recover her funds from Severson.

### E.

Finally, we consider prior cases with similar misconduct for guidance. We believe the most apposite cases are *In re Ray*, 368 N.W.2d 924 (Minn. 1985) and *In re Dillon*, 371 N.W.2d 548 (Minn. 1985). In *Ray*, we suspended an attorney for 3 years who made multiple investments of clients' money, with and without the clients' knowledge or consent, in investments in which the attorney had a substantial interest. 368 N.W.2d at 924-27. The records of the transactions were inadequate. *Id.* at 925-26. Several of the clients profited from the investments. *Id.* at 925. Much of the money was repaid, though not all of it. *Id.* at 925-26. We declined to adopt the referee's 5-year recommended suspension due to mitigating circumstances. *Id.* at 927.

In *Dillon*, the attorney borrowed $65,000 from a client, his former sister-in-law, to repay a business debt.[14] 371 N.W.2d at 548-49. The loans were secured by the

_____

[14] Severson cites several cases involving misrepresentations to support a 90-day suspension, contending that when an attorney's misconduct includes misrepresentations, "the discipline for the misrepresentation tends to overshadow other misconduct." We disagree. It would understate the appropriate discipline to focus solely on Severson's misrepresentations and ignore the serious conflict of interest violations he committed that involved a significant amount of money and harm to the client.

(Footnote continued on next page.)

attorney's contingent fee. *Id.* at 549. The attorney failed to explain that he was not acting as the client's lawyer, or to disclose the adverse nature of their interests in the agreement. *Id.* After the client hired another attorney and reached a settlement in the underlying litigation, the attorney sent a letter to his former client, which included misrepresentations. *Id.* Although the attorney repaid some of the money, he still owed the client over $36,000 at the time of the hearing. *Id.* We indefinitely suspended the attorney for a minimum of 1 year. *Id.* at 552.

Severson's case is similar to *Ray* and *Dillon* because they all involve improper investment agreements with clients and the failure to comply with the conflict of interest rules. *Dillon*, 371 N.W.2d at 548-50; *Ray*, 368 N.W.2d at 924-96. In all of these cases, the clients did not receive all of their money back. *Dillon*, 371 N.W.2d at 549; *Ray*, 368 N.W.2d at 926. *Ray* is also similar to Severson's case because of the existence of mitigating factors. 368 N.W.2d at 927. Overall, however, this case is more similar to *Dillon* because the attorney had a close relationship with the affected client, made misrepresentations, and the misconduct involved one client. 371 N.W.2d at 549, 552.

---

(Footnote continued from previous page.)

Severson also cites conflict of interest cases that are distinguishable. Specifically, he cites to conflict of interest cases involving admonitions in which the attorneys loaned less than $4,000 to the clients. *See In re Fraley*, 621 N.W.2d 727, 727 (Minn. 2001) (order); *In re Panel Matter No. 97-22*, 425 N.W.2d 824, 825 (Minn. 1988) (affirming the private admonition of an attorney who made $3,617 in loans to a client). He also cites a case involving a conflict of interest and misrepresentations, but it does not involve misrepresentations over the course of years or business transactions with clients involving significant sums of money. *See In re Frauenshuh*, 605 N.W.2d 394, 394-95 (Minn. 2000) (order) (publicly reprimanding attorney for entering into assignment of a contract for deed with a client, altering the assignment and contract for deed after execution, and making misrepresentations to the Director).

We conclude that when considered in its totality, Severson's misconduct is very serious. Severson violated the conflict of interest rules by entering into an investment agreement with a client that involved a substantial sum of money and had terms that were unfair and unreasonable. Severson further violated the rules by having that same client assign and mortgage her interest in a building without disclosing that doing so was for his benefit. These business transactions harmed the client, who had to sue Severson in order to get her money back and in the end did not recover one-third of the principal she had entrusted with Severson. Moreover, Severson committed multiple acts of dishonesty by failing to disclose that the assignment and mortgage of the equine center was for his own personal interest, failing to disclose that he, and not his law firm, generated four invoices he used to try to obtain an offset of the amount he owed the client, and making misrepresentations to the Director. Also, Severson did not exhibit remorse for his misconduct, or the effect his misconduct had on his client. Severson has not cited any case that includes multiple misrepresentations and conflicts of interest, involving a substantial sum of money, in which we have imposed a suspension of less than 1 year. We therefore conclude that the appropriate discipline is an indefinite suspension with no right to petition for reinstatement for a minimum of 1 year.

Accordingly, we order that:

1. Respondent Larry S. Severson is indefinitely suspended from the practice of law in the State of Minnesota, effective 14 days after the date of the filing of this opinion, with no right to petition for reinstatement for a minimum of 1 year;

27

2.	Respondent may petition for reinstatement pursuant to Rule 18(a)-(d), Rules on Lawyers Professional Responsibility (RLPR).  Reinstatement is conditioned on successful completion of the professional responsibility portion of the state bar examination and satisfaction of continuing legal education requirements, pursuant to Rule 18(e), RLPR;

3.	Respondent shall comply with Rule 26, RLPR (requiring notice of suspension to clients, opposing counsel, and tribunals); and

4.	Respondent shall pay $900 in costs pursuant to Rule 24, RLPR.

# D I S S E N T

ANDERSON, Justice (dissenting).

Although I agree with the majority's conclusion that Severson violated Rules 1.7, 1.8, 8.1, and 8.4 of the Minnesota Rules of Professional Conduct, I respectfully dissent from the discipline imposed by the majority.

I begin with the observation that determining the appropriate discipline here is not free from doubt and reaching the appropriate result is more challenging than in some of our other cases. While we are the final arbiter of discipline, there is no doubt that our conclusions are informed by the recommendations of the referee. Here the referee recommended a 3-month suspension, concluding that protection of the public did not require a longer suspension. The majority effectively decides that not all of the referee's findings of wrongful conduct can be affirmed, but decides nonetheless that a longer suspension is required. I conclude that the referee has the better of the argument here.

"[T]he purpose of [attorney] discipline is not primarily punitive but 'to guard the administration of justice and to protect the courts, the legal profession and the public.' " *In re Serstock*, 316 N.W.2d 559, 561 (Minn. 1982) (quoting *In re Hanson*, 258 Minn. 231, 233, 103 N.W.2d 863, 864 (1960)). Disciplinary sanctions not only protect the public from future unethical behavior, but also "deter future misconduct by the disciplined attorney as well as by other attorneys." *In re Albrecht*, 779 N.W.2d 530, 540 (Minn. 2010) (internal quotation marks omitted) (quoting *In re Vaught*, 693 N.W.2d 886, 890 (Minn. 2005)).

Some measure of discipline is warranted here. Severson conceded an attorney-client relationship with D.S. from 2004-2009, and therefore he violated Rules 1.7 and 1.8 during that period, although the referee found that D.S. suffered no losses as a result of those violations. Severson also concedes that the false invoices had a "misleading effect," although he contends that the referee's findings do not prove that anyone was actually misled.

The majority concludes that Severson and D.S. had an attorney-client relationship when they entered into the investment agreement, based on the referee's finding that Severson drafted an investment agreement and a power of attorney. Although these findings and conclusions by the referee are not clearly erroneous, the existence of an attorney-client relationship in 1996 is tenuous at best. To his credit, the referee agreed, stating that "a reasonable counter-argument could be made under the facts and especially under the law." The referee therefore recommended a 3-month suspension, or a public reprimand if we concluded that no attorney-client relationship existed in 1996. By contrast, in the conflict-of-interest cases cited by the majority, the attorney clearly represented the client before the inappropriate business relationship commenced. *See In re Dillon*, 371 N.W.2d 548, 550 (Minn. 1985); *In re Ray*, 368 N.W.2d 924, 924-26 (Minn. 1985). The results here show the dangers of engaging in business relationships with those who are arguably clients of the lawyer. That said, because of the unusual relationship of the parties and the facts underlying and surrounding the execution of the

power of attorney,[1] it is my conclusion that the imposition of discipline is more appropriately focused on serious, and largely undisputed, violations: the misrepresentations made to D.S., the Director, and others.

I therefore conclude, based on the record before us, that the referee's recommendation of a 3-month suspension is appropriate here, even though there remain substantial questions about investment decisions made by Severson while handling funds belonging to D.S. Although the referee's findings and conclusions are not binding on us, the referee is in the best position to assess the credibility of witnesses. In this case, the referee, after hearing the testimony of all of the relevant parties, noted that Severson's actions were not "underhanded, malicious, or predatory," and that he acted in order to benefit a young woman who was like a daughter to him.[2] The referee made no findings

---

[1] The majority relies on the drafting of both the investment agreement and the power of attorney in concluding that an attorney-client relationship existed. The power of attorney is clearly a legal document that may be, and often is, drafted by an attorney, and that is sufficient evidence of an attorney-client relationship. I see no reason to reach the question of whether the drafting of the investment agreement also implicates the attorney-client relationship.

[2] I disagree with the majority's conclusion that Severson's lack of remorse is an aggravating factor. The referee, who was in the best position to determine Severson's credibility and demeanor, concluded that remorse was neither an aggravating nor mitigating factor. *See In re Moulton*, 721 N.W.2d 900, 905 (Minn. 2006) ("Deference to the referee is particularly appropriate when the findings are based on a respondent's demeanor, credibility, or sincerity." (citing *In re Pinotti*, 585 N.W.2d 55, 62 (Minn. 1998))). This conclusion is supported by the record because Severson was remorseful about losing his relationship with D.S. and his inability to repay her in full, but Severson's showing of remorse was limited by his decision to deny allegations of misconduct. I would therefore find that the referee did not clearly err by declining to consider lack of remorse as an aggravating factor.

that the unusual facts here constitute a risk to the public requiring more severe discipline of Severson.

We have imposed the same or lesser penalties on attorneys who committed more serious acts of dishonesty. *See, e.g.*, *In re Czarnik*, 759 N.W.2d 217, 224 (Minn. 2009) (imposing a 3-month suspension on an attorney who lied under oath); *In re Jain*, 587 N.W.2d 291, 291-92 (Minn. 1999) (order) (imposing a public reprimand and 2 years supervised probation on an attorney who misrepresented the status of a case to her client for 9 months); *In re Iliff*, 487 N.W.2d 234, 235-36 (Minn. 1992) (imposing a 3-month suspension on an attorney who intentionally misled the Director regarding a fabricated settlement); *In re Ruffenach*, 486 N.W.2d 387, 389-91 (Minn. 1992) (imposing a 3-month minimum suspension on an attorney who falsified two court-ordered financial disclosure forms and had been disciplined four times in the past). Greater discipline has usually been reserved for cases in which the attorney intentionally defrauds clients or other parties. *See, e.g.*, *In re Jagiela*, 517 N.W.2d 333, 334 (Minn. 1994) (imposing a 6-month suspension on an attorney who backdated an agreement, submitted the agreement to the court and opposing counsel, and failed to correct false statements related to the agreement); *In re Boyd*, 430 N.W.2d 663, 663-64, 666-67 (Minn. 1988) (imposing a 6-month suspension on an attorney who forged, backdated, notarized, and filed a warranty deed and had previously been reprimanded three times). Although Severson made

potentially misleading statements, the record contains no evidence that any party was actually misled, let alone misled to their detriment.[3]

A lawyer's first responsibility is to represent his client's interests. There is great peril for both lawyer and client when, as here, the client's interests and the lawyer's interests are intertwined. Severson's failure to make his client's interests the paramount concern necessitates discipline. Given the unique facts in this record, however, I would suspend Severson from the practice of law for 3 months as recommended by the referee.

GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Anderson.

---

[3] The majority concludes "the referee's finding that Severson made intentional misrepresentations in letters to the Director about when D.S.'s money was invested in FSSCF was not clearly erroneous." This statement is accurate as far as it goes, and I would not disagree with the court's conclusion. There are additional facts here, however, that suggest the materiality of these misrepresentations may be doubtful. It is undisputed that these communications occurred between Severson's lawyer during the disciplinary proceedings and the Director, and the initial letter from the lawyer correctly reported that this transaction occurred in 2002. Later communications from the lawyer stated this transaction occurred in 1996 before it was finally reported that the 2002 date initially disclosed was, in fact, the correct date. The significance of these discrepancies is not clear. I am more troubled by Severson's assertion that he does not remember where the $500,000 entrusted to him by D.S. was invested between 1996 and 2002. The referee made no findings on the credibility of Severson's assertion that he does not remember where this substantial sum of money was invested during that 6-year time period. But we impose discipline based on facts found and conclusions reached, not speculation.